**In re the Termination of the Parent–Child Relationship of M.W., Minor Child,**

**and**

**M.B., Mother, Appellant–Respondent,**

**v.**

**Indiana Department of Child Services, Appellee–Petitioner.**

**No. 32A01–1006–JT–382.**

Court of Appeals of Indiana.

Feb. 18, 2011.

---

Paula M. Sauer, Danville, IN, Attorney for Appellant.

Matthew A. Skeens, DCS, LaGrange County Office, LaGrange, IN, Robert J. Henke, DCS, Central Administration, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

M.B. ("Mother") appeals the termination of her parental rights to her child, M.W. We reverse.

### Issue

Mother raises two issues, which we consolidate and restate as whether the Department of Child Services ("DCS") presented clear and convincing evidence to support the termination of Mother's parental rights.

### Facts

Mother and M.W. ("Father") had a child, M.W., who was born in April 2006. Mother and Father initially lived together, but Father moved out in 2008. In July 2008, DCS became involved with Mother and M.W. because Mother had been using morphine, and the parties entered into an informal adjustment. Mother was on probation for a theft conviction, and in September 2008, Mother was arrested for a probation violation due to drug use. At that time, DCS removed M.W. and placed her in foster care. At the time of the removal, Father was travelling outside of the State due to his employment. DCS filed a petition alleging that M.W. was a child in need of services ("CHINS"), and Mother agreed that M.W. was a CHINS.

In October 2008, the trial court ordered Mother to participate in a variety of services, including participate in home based

counseling, submit to a psychiatric evaluation and comply with all recommendations, participate in routine visitation with M.W., establish paternity, submit to random drug screens, submit to a drug and alcohol evaluation and comply with all recommendations, secure suitable housing and employment, resolve any and all criminal proceedings, and reimburse the DCS for expenses.

During part of the CHINS proceeding, Mother was living with her boyfriend, but there were domestic violence issues in the household. The DCS case manager observed bruises on Mother's arms in January 2009, and in February 2009, Mother had two blackened and swollen eyes and bruises on her arms. Mother moved into Sheltering Wings, a shelter for women and children, but she only stayed at the shelter for two and one-half months. She was ultimately asked to leave the shelter because she failed to regularly attend required meetings, and a probation violation allegation was filed as a result of Mother leaving Sheltering Wings.

In February 2009, the DCS case manager advised Mother that a petition to terminate her parental rights "could be filed [after] fifteen months if she failed to follow through with the services recommended." Tr. p. 106. In March or April 2009, the DCS internally decided to move toward termination of Mother and Father's parental rights. However, in late April 2009, the DCS filed a permanency plan listing reunification with Mother and Father as the plan for M.W., and in early May 2009, the trial court approved that permanency plan. Despite the approved plan, just days later, on May 18, 2009, the DCS filed a petition to terminate Mother and Father's parental rights to M.W.

In May 2009, the DCS also filed a contempt petition against Mother and Father. Regarding Mother, the DCS case manager testified that, among other things, Mother had failed a random drug screen, had no employment, had no suitable housing, failed to complete a mental health evaluation, and had inconsistent visitations with M.W. The trial court found Mother in contempt and ordered her to strictly comply with the prior orders.

Mother was incarcerated again from April 2009 until August 2009, for another probation violation. Additionally, in June 2009, Mother pled guilty to consumption of an alcoholic beverage by a minor as a Class C misdemeanor and was sentenced to forty-two days in jail. In July 2009, she pled guilty to possession of a controlled substance as a Class D felony and was sentenced to 545 days with 365 days suspended, 180 days in jail, and 365 days of probation. Mother moved in with her father after she got out of jail, but that residence was deemed inappropriate for M.W. because of her father's criminal history and abuse of Mother.

At a hearing on August 6, 2009, DCS requested permission from the trial court to discontinue services, and the trial court granted that request. In September 2009, the trial court held a hearing on DCS's petition to terminate parental rights. Both Mother and Father appeared at the hearing. At the end of the first day of the hearing, the trial court informed DCS that it had "a really serious problem with [DCS] telling these [parents] on a day certain in April that their plan is to reunify them and then without any justifiable reason filing a termination" petition. Id. at 163–64. The trial court stated that the DCS's procedure was "not professional[ ]." Id. at 164. The trial court noted that, as of that time, the DCS had not met its burden of showing by clear and convincing evidence that the parents' rights should be terminated.

On October 1, 2009, the parties filed an amendment to the disposition/parental participation plan ("Amended Plan"), which the trial court approved. The Amended Plan provided, in part:

> The parents understand that when a child is out of the parents care for 15 of the past 22 months that it is mandatory that the DCS file for termination of parental rights. Upon entering this agreement, DCS agrees to continue the present TPR.... The parents are being given one last chance to STRICTLY COMPLY with the terms of the orders.... If the parents fail to STRICTLY comply, DCS will amend its Involuntary Petition for Termination of Parental Rights to include the noncompliance and proceed with the involuntary termination of parental rights....

DCS's Exhibit 5 p. 2. The Amended Plan required Mother to: maintain employment and income; notify DCS of changes in her living situation; participate in home based counseling; secure a mental health evaluation and complete any recommendations; establish paternity; participate in visitations with M.W.; participate in random drug screens; strictly comply with the recommendations of her Pro–Active Resources drug/alcohol evaluation; and strictly comply with probation requirements.

Shortly thereafter, on October 18, 2009, Mother suffered bleeding in her brain and a severe stroke. As a result of the stroke, Mother was hospitalized and placed in a rehabilitation facility for two and a half months. Mother then spent two months in a nursing home. She was partially paralyzed on her right side and uses a walker, but she was expected to make a full recovery within six to twelve months. After leaving the nursing home, she moved into her father's residence. However, her father was not giving her food, was taking her money, and was being abusive to her. She began residing at Sheltering Wings again in late April 2010.

The trial court held another hearing on DCS's petition to terminate Mother and Father's parental rights on April 29, 2010. Mother did not appear for the first day of the hearing but appeared at the second day of the hearing. The DCS case manager testified that Mother had not completed home-based counseling with a focus on sobriety, domestic violence, anger management, and victims of sexual abuse counseling and that Mother had completed a substance and alcohol abuse evaluation but failed to complete the recommendations. After the stroke, DCS asked Mother to reenroll in a drug and alcohol evaluation. Mother refused and stated that she would prefer to do services in home once M.W. was returned to her. Mother completed a mental health evaluation in March 2010, which indicated that she was not ready to parent M.W. and did not understand child development, age appropriate discipline techniques, and parent-child roles. The evaluator recommended that Mother take a parenting class.

At the time of the hearing, Mother's probation was terminated as a result of her medical condition, and she had resolved all of her criminal matters. Mother received social security disability payments. As for visitations with M.W., twenty-one visits were offered to Mother between November 14, 2008 and March 13, 2009, and she missed seven visits. From September 2009 until the time of her stroke, Mother was consistent with her visitation. Visitations resumed in December 2009. She then missed visits on December 9 and 16, 2009, and February 15, March 17, 24, 31, and April 14, 2010.

Mother's housing situation was unsuitable during most of the CHINS and termination proceedings. Between incarcera-

tions, Mother had resided with her abusive boyfriend and her abusive father. However, as of the second day of the termination hearing, Mother was living at Sheltering Wings. She was eligible to live there for two years, and M.W. was eligible to live with her.

After the hearing, the trial court entered findings of fact and conclusions thereon terminating Mother's parental rights. The trial court found:

9. As of the date of the termination hearing, [Mother] and [Father] participated in minimal visitation whether by reason of their incarceration or lack of interest in the child. Neither [Mother] nor [Father] were employed as of the date of the hearing, [Father] being incarcerated in prison. Neither [Mother] nor [Father] had the ability or means to take care of their minor non-marital child. Neither [Mother] nor [Father] have appropriate residences or means to support the minor non-marital child....

10. The Guardian Ad Litem in this case filed a report on 31 July, 2009, advising the Court that the parental rights of the parties should be terminated.

11. Based upon the entire history of lack of cooperation by the parents with the terms and conditions of the numerous times that they have been given the opportunity to reunite with [their] minor non-marital child, this Court finds it is unlikely that the continued reasons for removal are soon to be remed[ied] and that the Department of Child Services has an adequate plan for the care and treatment of the minor non-marital child, [M.W.].

THEREFORE, THE COURT FINDS that based upon the entire history of this case, the Indiana Department of Child Services has prove[n] by clear and convincing evidence that parental rights in the non-marital child, [M.W.], in [Mother] and [Father] should be terminated.

App. p. 90–91. Mother now appeals.[1]

### Analysis

■■■ Mother argues that DCS failed to present clear and convincing evidence to support the termination of her parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind.2010). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)). "Indeed the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *Neal v. DeKalb County Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). We recognize of course that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* (citing *In re D.D.*, 804 N.E.2d 258, 264–65 (Ind.Ct.App.2004), *trans. denied*). Thus, "[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities." *Id.* (quoting *D.D.*, 804 N.E.2d at 265).

■■■ When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *Id.* We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due

---

1. The trial court also terminated Father's parental rights, and we address his appeal of the termination separately. *See In re M.W.*, No. 32A01–1006–JT–382 (Ind.Ct.App. 2011).

regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)). Here, the trial court entered findings of fact and conclusions thereon in granting DCS's petition to terminate Mother's parental rights. When reviewing findings of fact and conclusions thereon entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

Indiana Code Section 31–35–2–8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31–35–2–4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31–35–2–4(b)(2)[2] provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part, that:

(B) there is a reasonable probability that:

(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or

(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

The State must establish these allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare,* 592 N.E.2d 1232, 1234 (Ind.1992).

We first address Mother's argument that the trial court's findings of fact and conclusions thereon are lacking because the trial court did not specifically conclude that termination was in M.W.'s best interest. Indiana Code Section 31–35–2–4(b)(2) requires DCS to prove by clear and convincing evidence that termination is in the best interests of the child. We have held that, although trial courts are not statutorily required to enter findings of fact and conclusion thereon in termination of parental rights cases, "the rights involved are of constitutional magnitude," and "a judgment terminating the relationship between a parent and child is impossible to review on appeal if it is nothing more than a mere recitation of the conclusions the governing statute requires the trial court to reach." *In re A.K.,* 924 N.E.2d 212, 220 (Ind.Ct. App.2010), *trans. dismissed.* Thus, we require trial courts to "enter findings of fact that support the entry of the conclusions called for by Indiana statute and the common law." *Id.*

In *A.K.,* the trial court's order merely recited the statutory requirements for termination and did not include any findings of fact to support those conclusions. We remanded to the trial court for the entry of factual findings to support the order. Here, unlike in *A.K.,* the trial court did enter findings of fact and merely failed to include a statement that termination was in M.W.'s best interest. Despite the trial court's failure to state this conclusion in its order, given the trial court's findings of fact and ultimate grant of termination, we have enough information to review the trial court's termination of Mother's parental

**2.** Indiana Code Section 31–35–2–4 was amended effective March 12, 2010 by Pub.L. No. 21–2010, § 8. However, the amendment is not applicable here.

rights on appeal. Consequently, we will address Mother's other arguments rather than remand for the entry of a new order.

■■■ Mother argues that the trial court's findings and conclusions are clearly erroneous regarding whether there was a reasonable probability that conditions that resulting in M.W.'s removal will not be remedied.[3] In making this determination, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind.Ct.App.2001), *trans. denied*. However, the trial court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* The trial court can properly consider the services that the State offered to the parent and the parent's response to those services. *In re C.C.*, 788 N.E.2d 847, 854 (Ind.Ct. App.2003), *trans. denied*.

Mother relies upon *In re J.M.*, 908 N.E.2d 191 (Ind.2009), which we find analogous to the circumstances here. In *J.M.*, both the mother and father were incarcerated on methamphetamine-related charges in 2004, and their child was ultimately found to be a CHINS. A petition to terminate the parents' parental rights was filed, and a hearing was held in early 2008. The trial court denied the petition to terminate parents' parental rights, and the guardian ad litem appealed. Our supreme court affirmed the trial court's denial of the petition. In particular, our supreme court noted that the father anticipated a release from prison in mid–2008 and that the mother anticipated a release from prison in mid–2009. They were in fact released from prison, participated in available services offered at the prisons, had a relationship with the child, and took steps to provide permanency for the child upon their release from prison. The court noted that parents' "ability to establish a stable and appropriate life upon release can be observed and determined within a relatively quick period of time." *J.M.*, 908 N.E.2d at 196.

We acknowledge that *J.M.* concerned incarcerated parents who were being released from prison soon after the termination hearing and that Mother is not incarcerated and has resolved all of her criminal issues. However, DCS purportedly gave Mother a second chance with the Amended Plan and, due to circumstances beyond her control, Mother has been unable to take advantage of that second chance. Shortly after the Amended Plan, Mother had a severe stroke, was hospitalized for two and one-half months, and was in a nursing home for two months. Left partially paralyzed by the stroke, Mother then moved in with her family, who took her money, did not feed her, and was abusive to her. At the time of the termination hearing, Mother had made some progress at stabilizing her life. Mother had moved into shelter where she could reside with M.W., was receiving social security disability payments, and was expected to fully recover from the stroke. As in

3.  Indiana Code Section 31–35–2–4(b)(2)(B) is written in the disjunctive. Consequently, the DCS was required to demonstrate by clear and convincing evidence a reasonable probability that either: (1) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied, or (2) the continuation of the parent-child relationship poses a threat to the well-being of the child. *See, e.g., Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 148 n. 5 (Ind.2005); *In re T.F.*, 743 N.E.2d 766, 774 (Ind.Ct.App.2001), *trans. denied*. The trial court here did not find that the continuation of the parent-child relationship posed a threat to M.W.'s well-being.

*J.M.*, Mother's ability to establish a stable and appropriate life and properly parent M.W. can be observed and determined within a relatively short period of time.

 We acknowledge that, prior to her second chance, Mother made little progress in complying with her court-ordered services and was inconsistent with visitation. However, "[t]he involuntary termination of parental rights is the most extreme sanction a court can impose on a parent because termination severs all rights of a parent to his or her children." *I.A.*, 934 N.E.2d at 1136. "[T]ermination is intended as a last resort, available only when all other reasonable efforts have failed." *Id.* We are not convinced that all other reasonable efforts have been employed in this case to reunite Mother and M.W.

We share the trial court's concerns with how DCS proceeded in these CHINS and termination proceedings, and we urge trial courts to carefully review the process by which these decisions are made. Although Mother ultimately may be unable to regain custody of M.W., the process by which termination occurs should be fair and equitable. DCS agreed to give Mother a second chance and should follow through with its agreement. We conclude that DCS failed to carry its burden of establishing, by clear and convincing evidence, a reasonable probability that conditions that resulting in M.W.'s removal from Mother will not be remedied.[4] *See also In re G.Y.*, 904 N.E.2d 1257 (Ind.2009) (reversing the termination of mother's parental rights where she was scheduled for release from incarceration approximately eighteen months after the termination hearing, mother was bonded with child, mother's crimes occurred prior to the child's birth, mother

had addressed her drug issues and participated in available services while incarcerated, and mother was committed to maintaining a parental relationship with the child). Because the trial court's conclusion is clearly erroneous, we reverse the trial court's grant of DCS's petition to terminate Mother's parental rights.

### Conclusion

Given DCS's agreement to give Mother a second chance, Mother's severe stroke, and Mother's recent progress at stabilizing her life, the trial court's findings are not supported by clear and convincing evidence. We reverse the trial court's termination of Mother's parental rights.

Reversed.

BAKER, J., and VAIDIK, J., concur.

---

4. Because this conclusion is clearly erroneous, we need not address Mother's argument that DCS failed to show by clear and convinc-ing evidence that termination was in M.W.'s best interests.