**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**MARK SMALL**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**PAUL SCHNEIDER**
Shoals, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: <br><br> K.E.G-H (Minor Child), <br><br> AND <br><br> D.G. (Father), <br><br> Appellant-Respondent, <br><br> vs. <br><br> THE INDIANA DEPARTMENT OF CHILD SERVICES, <br><br> Appellee-Petitioner. | ) ) ) ) ) ) ) ) ) ) ) ) ) No. 51A01-1204-JT-174 ) ) ) ) ) ) |

APPEAL FROM THE MARTIN CIRCUIT COURT
The Honorable Lynne E. Ellis, Judge
Cause No. 51C01-1101-JT-7

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

STATEMENT OF THE CASE

Appellant-Respondent, D.G. (Father), appeals the trial court's termination of his parental rights to his minor child, K.E.G.-H. (Child).

We affirm.

ISSUE

Father raises two issues on appeal, which we consolidate and restate as the following single issue: Whether the evidence was sufficient to support the termination of Father's parental rights.

FACTS AND PROCEDURAL HISTORY

Child was born on November 18, 2006 to C.S. (Mother) and Father. At the time, Father was Mother's stepfather. In 2009, Mother resided with the Child, the Child's younger half-sibling, Mother's husband, M.S., as well as the Child's maternal grandmother (Grandmother) and Father. On May 22, 2009, the Martin County Department of Child Services (DCS) visited their residence, a trailer, to investigate a domestic violence incident involving Mother and M.S. At that time, DCS learned that the Child was the child of Mother and Father. DCS found no signs of abuse or neglect and later conducted a follow-up interview with Grandmother and M.S. on May 26, 2009.

On June 17, 2009, DCS received a report concerning conditions in the family's home and visited the following day to assess the home environment. DCS informed M.S. and Mother about the report and inspected the trailer. Cat feces was piled in a litter box without litter, an electrical outlet with exposed wiring was covered by a nightstand, stacked items in a bedroom posed a fire hazard and feces lined a toilet bowl. DCS found the Child sleeping on Father's bed; Mother's other child was sitting in a car seat, rather than a baby chair. On June 24, 2009, DCS returned and noted that the residence had been cleaned, but traces of fecal matter remained in the toilet along with unidentified debris resembling fecal matter near the cat food dishes. M.S. remarked to DCS that Father and Mother's relationship was a mistake that had happened in Alabama before Mother became an adult.

On July 2, 2009, DCS received a report that Mother had been arrested the previous night for domestic violence involving M.S. and Mother's other child. Later that day, DCS interviewed M.S., who told DCS that Father and Mother continued to have sex and that he was uncomfortable with the Child sleeping in the same bed as Father. M.S. also claimed that Father changed the Child's diapers and paid special attention to her vaginal area. DCS returned to the family's residence that night. It found cockroaches, rotting food in the refrigerator, the walls covered in filth, and the Child noticeably dirty. Shortly thereafter, DCS obtained a verbal order for emergency detention and removed the Child.

On July 9, 2009, DCS filed its petition alleging that the Child and her half-sibling were children in need of services (CHINS), which was subsequently amended on August

26, 2009. Thereafter, DCS received reports from Alabama, where Mother and M.S. were involved with a separate child removal case. Psychological evaluations conducted in connection with the Alabama case revealed that "[Mother's] molestation by her step father ([Father] – [Child's] father) started when [Mother] was very young." (DCS Exh. # 6, p. 8). In 2007, Father was convicted in Indiana for sexual misconduct with a minor, *i.e.*, Mother, in violation of Ind. Code § 35-42-4-7. Additionally, Father was convicted of child molesting, a Class C felony, I.C. § 35-42-4-3(b), resulting from a 1993 incident involving his eleven or twelve year old stepdaughter from a prior marriage. As a result of his convictions, Father is subject to lifetime registration as a sex offender.

On December 3, 2009, DCS filed its second amended CHINS petition, which included information regarding Father's prior convictions. On February 4, 2010, both Mother and Father admitted that the Child was a CHINS. On June 2, 2010, the trial court entered a parental participation order which, among other obligations, required Father to obtain a risk assessment and psychological evaluation through a behavioral services provider and to follow all recommendations.

On February 10, 2011, DCS filed a petition for termination of Father and Mother's parental rights to the Child. On December 5, 2011 and February 15, 2012, the trial court conducted hearings on the petition. At the end of the second hearing, Mother agreed to voluntarily terminate her parental rights to the Child and the trial court directed the

parties to file their proposed findings and conclusions. On April 4, 2012, the trial court issued its Order terminating Father and Mother's parental rights to the Child.[1]

Father now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

I. *Standard of Review*

We review the termination of parental rights with great deference. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). We will not reweigh the evidence or judge the credibility of witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id*. In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating parental rights only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied*, 534 U.S. 1161 (2002).

Here, the Order terminating Father's parental rights contains specific findings of fact and conclusions thereon. Accordingly, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We determine first whether the evidence supports the findings and second whether the findings support the judgment. *Id*. A finding is clearly erroneous when there are no facts or inferences drawn therefrom that support it. *In re D.D.*, 804 N.E.2d at 265. A judgment is clearly erroneous only if the findings do not support the trial court's

---

[1] Mother is not a party to this appeal.

conclusions or the conclusions do not support the judgment. *Bester*, 839 N.E.2d at 147.

If the evidence and inferences support the trial court's decision, we must affirm. *In re*

*L.S.*, 717 N.E.2d at 208.

## II. *Sufficiency of Evidence Supporting Termination*

On appeal, Father contests the sufficiency of the evidence supporting the

termination of his parental rights. To terminate his parental rights, DCS was required to

allege and prove by clear and convincing evidence each of the four elements listed in I.C.

§ 31-35-2-4(b)(2)(A-D). *See In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009). Clear and

convincing evidence requires the existence of a fact to be "highly probable." *Hardy v.*

*Hardy*, 910 N.E.2d 851, 859 (Ind. Ct. App. 2009). Here, Father only challenges the trial

court's findings and conclusions pertaining to subsection (b)(2)(B), which requires that

one of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

I.C. § 31-35-2-4(b)(2)(B).

Father asserts that clear and convincing evidence does not support a reasonable

probability that the conditions resulting in the Child's removal will not be remedied or

that continuation of the parent-child relationship poses a threat to the Child's well-being.

6

While the trial court determined that there was a reasonable probability that continuation of the parent-child relationship posed a threat to the Child's well-being, its findings of fact and conclusions of law do not mention whether a reasonable probability that conditions that resulted in the Child's removal will not be remedied. However, such determination is unnecessary because I.C. § 31-35-2-4(b)(2)(B) is written in the disjunctive, and therefore, the trial court only had to find one of the three requirements of subsection (b)(2)(B) by clear and convincing evidence. *In re L.S.*, 717 N.E.2d 204, 209 (Ind. Ct. App. 1999), *trans. denied*. Consequently, we address Father's latter argument only.[2]

Father first asserts that he substantially complied with all obligations imposed by the parental participation order. We disagree. The parental participation order required Father to maintain employment, housing, attend visitations and appointments with DCS and its service providers, and pay child support. It also required Father to obtain a risk assessment and psychological evaluation from Dr. Sean Samuels (Dr. Samuels) and to follow all his recommendations. Father saw Dr. Samuels for a psychological examination in February 2010. He informed Dr. Samuels that his 1993 child molestation

---

[2] Father prefaces his arguments with a discussion on whether a reasonable probability exists that conditions justifying the Child's removal and continued placement outside the home will not be remedied. *See* I.C. § 31-35-2-4(b)(2)(B)(i). Only one of Father's three arguments (that he is not the cause of the Child's removal and that whatever conditions precipitating the same have been remedied) clearly addresses subsection (b)(2)(B)(i). In the latter part of his brief, Father acknowledges the trial court's finding and conclusion under subsection (b)(2)(B)(ii). We therefore consider Father's remaining two arguments when reviewing the trial court's determination. In so doing, we note that the same evidence may be used to prove more than one element of the parental rights termination statute. *See In re A.K.*, 924 N.E.2d 212, 221 (Ind. Ct. App. 2010), *trans. dismissed*.

conviction of his stepdaughter was connected to sexual deprivation from his first wife. Father claimed his 2007 child seduction conviction involving Mother was connected to his second wife's devotion to bingo. In each case, Dr. Samuels concluded that certain triggers caused Father to relieve his stress by having sexual relations with his respective stepdaughters. Dr. Samuels also administered a number of personality tests including one to determine Father's sexual violence risk. Dr. Samuels believed Father presented a "[moderate risk] for recidivism of [sexual violence] with individuals located within or near to his family constellation." (DCS Exh. #3, p. 11). Dr. Samuels issued recommendations that Father complete a tailored intervention program and maintain a large support network of persons aware of his past offenses. However, Dr. Samuels cautioned that until Father completed his treatment, he "should under no circumstances be left unattended with post-pubescent minor children." (DCS Exh. #3, p. 14).

In September 2010, Father began counseling with a licensed clinical social worker, Joanie Reagan (Reagan), who offered sex offender treatment and sexual addictions therapy. Father was given an initial assessment, and Reagan's recommendations were that he complete a thorough sexual history and victim empathy assignments, prepare a relapse prevention plan, and take a sexual history disclosure polygraph. Father participated in group therapy, attending 18 of 30 group sessions until June 2011. Reagan found that he was cooperative, but quiet. However, Father denied that he had a problem. Notably, instead of completing the treatment recommended by Reagan, Father designed his own program based on his religious beliefs and refused to

8

take the sexual history disclosure polygraph. Reagan testified that while her treatment was designed to assist a person with handling triggers for inappropriate sexual behavior, Father's treatment plan did not address such triggers. Further, Reagan explained that a sexual history disclosure polygraph was a necessary step for proper diagnosis, as treatment varied depending on the number of victims in the family. Reagan opined that Father should always be supervised around "anybody under the age of eighteen" and required a safety and supervision plan to insure against inappropriate behavior. (Transcript p. 107).

Based upon this testimony, the trial court found:

20. Although the evidence indicates [Father] did what was requested by [DCS] in order to visit his [Child], the evidence is undisputed that he failed to properly address his sexual maladaptive therapy. Given this failure, and the high risk of recidivism of his sexual perpetration on children, there is a reasonable probability that continuation of the parent-child relationship will pose a threat to the well-being of the [C]hild.

(Appellant's App. p. 20).

We agree with the trial court. A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). Instead, when the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate. *Id*.

Although there is no dispute that he complied with the parental participation order's requirements on employment, visitation, housing, and substance abuse, Father did

not comply with services regarding his prior sexual offenses. The trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Bester*, 839 N.E.2d at 152. At the same time, however, a trial court should judge a parent's fitness to care for his child as of the time of the termination proceeding, taking into consideration evidence of changed conditions. *Id.* Reagan testified that Father's participation in sex offender treatment was inconsistent. In light of his two prior convictions for sexual crimes involving his minor step-children, Father's refusal to admit responsibility and his election to deviate from the treatment offered presents an unacceptably high risk if the Child was returned to his custody. Given the evidence of Father's convictions as well as his non-compliance with the treatment offered to him, we conclude that DCS provided sufficient evidence that continuation of the parent-child relationship posed a threat to the well-being of the Child.

Finally, Father asserts that given the dissimilarity between his prior sex convictions and the age of the Child and his blood-relationship with her, the trial court erroneously concluded that continuation of their relationship would harm the Child's well-being. Essentially, Father argues that the trial court has not shown an actual threat to the Child because she is not post-pubescent or his stepdaughter. We cannot agree. Father asks us to reweigh the evidence, which we will not do. *See In re L.V.N.*, 799 N.E.2d 63, 69-71 (Ind. Ct. App. 2003). His prior criminal conduct, Dr. Samuels and Reagan's testimony, and the findings made by the trial court, demonstrate that he cannot provide a minimally safe, secure, and stable home for the Child. Thus, we conclude that

clear and convincing evidence supports the trial court's determination that continuation of the parent-child relationship posed a threat to the Child's well-being.

## CONCLUSION

Based on the foregoing, we conclude that there was sufficient evidence to support the involuntary termination of Father's parental rights.

Affirmed.

BAILEY, J. and CRONE, J. concur