924 N.E.2d 212 (2010)
In the Matter of the Termination of Parental-Child Relationship of A.K., Minor Child, and
A.S., Mother, and O.K., Father, Appellants,
v.
Indiana Department of Child Services, St. Joseph County, Appellee.
No. 71A05-0905-JV-261.
Court of Appeals of Indiana.
March 31, 2010.
*215 Brian J. May, Mark S. Lenyo, South Bend, IN, Attorneys for Appellants.

OPINION
MATHIAS, Judge.
O.K. ("Father") and A.S. ("Mother") appeal the involuntary termination of their parental rights to their child A.K. Both Mother and Father argue that the St. Joseph Probate Court's judgment terminating their parental rights is not supported by clear and convincing evidence. We affirm.

Facts and Procedural History
Mother and Father are the biological parents of A.K., born August 30, 2004. Father's paternity to A.K. was established shortly after her birth. Mother and Father were married on December 15, 2004, but the marriage was dissolved December 12, 2006. Father was awarded custody of A.K., and the court ordered that Mother "shall not have parenting time with the minor child until such time as recommended by a licensed mental health professional, and further order of this Court." Ex. Vol., DCS Ex. 3.
On March 22, 2007, Mother, Father, and A.K. were allegedly camping at Koontz Lake. The Walkerton Police Department was called to a convenience store due to the report of a domestic disturbance. Mother told a police officer that Father tried to attack her with a hatchet. Mother also stated that she, Father, and A.K. had been living in their van. The contents of the van supported Mother's assertion. Mother also alleged that Father was homeless and had been molesting A.K. A.K. was very dirty and had poor hygiene overall.
Father and Mother were both intoxicated when the police arrived to investigate the report. The police discovered that Father had an outstanding arrest warrant from Texas and he was taken into police custody. Father had a 1996 driving while intoxicated charge that was allegedly dismissed, but he was charged with "bail jumping" because he failed to appear for a bond hearing. Tr. p. 181.
A.K. was taken to the hospital, and medical personnel determined that, although A.K. was extremely dirty, there was no evidence of sexual abuse. Because of her condition, and her parents' homelessness, A.K. was detained by the St. Joseph County *216 Department of Child Services ("the DCS"). On April 4, 2007, the DCS filed a petition alleging that A.K. was a child in need of services ("CHINS") because Father had been arrested and extradited to Texas, and Mother, who was homeless, did not have custody of A.K. On the date of her removal, A.K. exhibited developmental delays, and she suffered from a urinary tract infection due to her poor hygiene. She also acted aggressively towards other children and bit her fingernails until they bled.
The probate court adjudicated A.K. a CHINS on April 18, 2007. Both Mother and Father were ordered to participate in the following services: complete a parenting assessment, a substance abuse program, and a domestic violence course, attend A.A. or N.A. meetings as recommended by a therapist, comply with drug screens, and participate in family therapy. Both parents were also ordered to maintain housing and employment and/or a stable source of income.
Mother did not remain in contact with the DCS consistently, which she claimed was due to illness. Mother attended narcotics anonymous meetings, and completed a parenting class. However, she never visited with A.K. and tested positive for cocaine in August 2008. Mother is under the care of a mental health professional. She suffers from bipolar disorder and schizophrenia.
While in jail in Texas, Father completed parenting classes, but upon his return to Indiana in July, 2008, the DCS recommended that he continue to participate in those classes. Father was not able to complete the court-ordered substance abuse evaluation because mental health issues prevented him from doing so. He was referred for a psychiatric evaluation at the Madison Center, but the results had not been received on the date of the termination hearing. In addition, Father did not complete a domestic violence class or attend A.A. or N.A. meetings as previously ordered. Father complied with some, but not all, of the random drug screens. Father also visited with A.K. and attended family therapy. Since his return to Indiana, Father has resided with his step-father. For support, he receives Social Security disability income and does "odd jobs." The DCS caseworker never visited Father's home. Father maintained that A.K. lived in the home prior to her detention by the DCS.
The petition to terminate Mother's and Father's parental rights was filed on June 26, 2008. At the termination hearing held on April 9, 2009, the court-appointed special advocate ("the CASA") testified that in her opinion, Mother is unable to properly care for A.K. She stated that Mother "is in and out of the picture a lot." The CASA's opinion was also based on the fact that Mother has two children who are in the custody of their father and her parental rights to two other children were terminated. Tr. pp. 13-14.
With regard to Father, the CASA testified that she did not believe that there is a bond between A.K. and Father, and that Father does not have "a basic knowledge of caring for a child." Tr. pp. 16-17. The CASA stated that A.K. has indicated that she is afraid of her Father, but that she does climb up onto Father's lap and tells him that she loves him. Tr. p. 19. The CASA believed that termination of Father's and Mother's parental rights is in A.K.'s best interests.
The DCS caseworker also stated that termination of parental rights is in A.K.'s best interests. She testified that during visitations, Father did not interact with A.K. and did not try to "engage with her." Tr. p. 61. She stated that A.K.'s behavior worsens after visits with Father. The *217 caseworker also testified that Father completed some of the services ordered, kept in contact with her, attended visitation and family therapy, and maintained stable housing. The DCS caseworker admitted that she had been suspended from her employment with the DCS because she has been charged with domestic violence in Michigan. She assumed that someone had taken over A.K.'s case, but was unaware of whether the case had actually been reassigned. Tr. pp. 68-69.
A.K.'s therapist also testified that A.K. acts out after visits with Father. Tr. p. 95. She stated that A.K. is cognitively and emotionally behind, but that A.K. is improving. The therapist noted that A.K.'s interaction with her foster mother "is excellent." Tr. p. 100.
The family consultant, who facilitated visitation between A.K. and Father, testified that with a few exceptions, Father generally did not interact with A.K. Tr. p. 116. She also stated that A.K. and Father appeared to have a bond, but "it is a bond [A.K.] would have with anybody that came to visit with her because the person is paying attention to her." Tr. p. 118. The family consultant believes that A.K. is frightened of Father.
On April 16, 2009, the probate court issued an order terminating Mother's and Father's parental rights. The court made no findings of fact, and the order stated in pertinent part:
Witnesses sworn, evidence taken and concluded.
The allegations of the petition are true in that: the child have [sic] been removed from the parent for at least six (6) months under a dispositional decree of this Court dated September 12, 2007, Cause Number 71J010703JC000141.
There is a reasonable probability that the conditions resulting in the removal of the child from her parents' home will not be remedied.
There is a reasonable probability that a continuation of the parent-child relationship will pose a threat to the well-being of the Child.
It is in the best interests of the child that the parent-child relationship be terminated.
[The DCS] has a satisfactory plan for the care and treatment of the child which is Adoption.
Appellant Father's App. p. 10; Appellant Mother's App. p. 6.
Mother and Father filed an appeal of the termination of their parental rights to A.K.[1] The appeal was fully briefed on October 7, 2009. On October 30, 2009, our court issued an order to Judge Peter Nemeth directing him "to enter a revised final order that contains complete findings of fact and conclusion of law that are fully supported by the evidence and that provide an explanation as to how its factual findings support its order." Judge Nemeth was ordered to enter the revised final order no later than November 30, 2009.
On November 25, 2009, Judge Nemeth filed a petition for extension of time, and our court granted his petition ordering him to file his revised final order "on or before January 15, 2010." On January 15, 2010, Judge Nemeth filed a motion to vacate our court's October 30, 2009 order. Specifically, he claimed that our court's order directing him to enter complete findings of fact and conclusions of law "is not authorized by the Indiana Rules of Procedure and usurps the power of the Supreme Court of Indiana to control practice and procedure in all the Courts of Indiana."
*218 On January 22, 2010, our court issued an order denying Judge Nemeth's motion to vacate. Judge Nemeth was also ordered to comply with our October 30, 2009 order no later than 4:30 p.m. on Thursday, February 11, 2010. Our January 22, 2010 order also stated: "Should the Honorable Judge Peter J. Nemeth fail to timely comply..., he is ORDERED to appear before this court on Friday, February 12, 2010 at 9:00 a.m. for a hearing to SHOW CAUSE why he should not be held in contempt for said failure to comply." In response, on January 29, 2010, Judge Nemeth filed a motion to transfer the proceedings to our supreme court.
On February 9, 2010, our supreme court dismissed Judge Nemeth's motion to transfer. On February 11, 2010, Judge Nemeth faxed his findings of fact and conclusions of law to the Clerk of the Indiana Court of Appeals. Specifically, the judge found:
1. [A.K.] was born on August 30, 2004.
2. The child's parents are [O.K. and A.K.].
3. The child was detained as a result of a domestic disturbance on March 22, 2007, in Walkerton, IN where mother reported that father attempted to attack her with a hatchet.
4. Mother, father and child had been living in a van for four (4) days at the time of detention.
5. Mother and father were intoxicated at the time of detention.
6. The child had developmental delays at the time of her detention including over-eating until she gagged, a "pusspod" in her nose, urinary tract infections due to poor hygiene, would bite and terrorize weaker children, and would bite her fingernails until they bled, and would urinate in inappropriate places.
7. The child has a deep fear of her father.
8. The child's behavior suffers after contact with her biological family.
9. Mother disappeared and was not seen by the Court Appointed Special Advocate (CASA) for five (5) months prior to trial.
10. Mother has had her parental rights terminated as to two other children.
11. Mother has done little to get her child back and often disappears for long periods of time.
12. Opiates were used by mother as her drug of choice.
13. Domestic violence occurred in the home between mother and father.
14. Mother was not allowed visitation with the child because she never had three consecutive clean drug screens.
15. Mother did not complete her drug classes; did not contact the DCS caseworker for over a year; and never bonded with the child.
16. Father did not bond with the child.
17. Father does not have a steady job or a home of his own.
18. Father does not interact well with the child during visits.
19. Father does not have the knowledge or interest to provide a suitable nurturing environment for the child.
20. Father did not complete parenting classes.
21. Father did not complete domestic violence class.
22. Father did not attend Alcoholics Anonymous (AA) or Narcotics Anonymous (NA).
23. Father has not paid support for the child since leaving prison.
24. Father will not acknowledge his drug problem and cannot demonstrate that he can remain drug free.

*219 25. The child becomes more aggressive after visiting with father.
26. The child's behavior improves when she does not have contact with her father.
27. The child has been in foster care for two (2) years.
28. The child has been seeing a therapist for sexual problems.
29. The child becomes more aggressive after visiting with father; there have been problems with defecating and bed wetting which are related to trauma, possibly from sexual abuse. The problem increased after father came into the picture (father was imprisoned on a warrant out of Texas at the time the child was detained and returned to the community in June, 2008).
30. The child has special needs and was placed in a therapeutic foster home with her current foster parents in April, 2007.
After receiving Judge Nemeth's revised final order, we acknowledged receipt of Judge Nemeth's findings of fact and discharged the January 22, 2010 order to show cause. In our February 11, 2010 order, we also granted the parties thirty days to file a response to Judge Nemeth's revised final order. Father filed a response to Judge Nemeth's revised order on March 15, 2010, but Mother failed to file a response. We now address the issues raised by Mother and Father in their Appellants' Briefs, and by Father alone in his response.

Standard of Review
This court has long had a highly deferential standard of review in cases concerning the termination of parental rights. In re K.S., 750 N.E.2d 832, 836 (Ind.Ct.App.2001). When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. In re D.D., 804 N.E.2d 258, 265 (Ind.Ct.App.2004), trans. denied. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. Moreover, in deference to the probate court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind.Ct.App. 1999), trans. denied.
We also observe that the DCS failed to file an appellee's brief or response to the trial court's revised final order. We will not undertake the burden of developing arguments for the appellee. Painter v. Painter, 773 N.E.2d 281, 282 (Ind.Ct.App. 2002). Applying a less stringent standard of review, we may reverse the probate court if the appellants establish prima facie error. Id. Prima facie error is defined as at first sight, on first appearance, or on the face of it. Id.

Discussion and Decision
The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. Bester v. Lake County Office of Family and Children, 839 N.E.2d 143, 147 (Ind.2005). A parent's interest in the care, custody, and control of his or her children is arguably one of the oldest of our fundamental liberty interests. Id. However, these parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. In re M.B., 666 N.E.2d 73, 76 (Ind.Ct.App. 1996), trans. denied. Parental rights may therefore be terminated when the parents are unable or unwilling to meet their parental responsibilities. In re K.S., 750 N.E.2d 832, 836 (Ind.Ct.App.2001).
*220 We first address the importance of findings of fact and conclusions of law in termination of parental rights proceedings. The probate court was not statutorily required to enter findings of fact in issuing its judgment involuntarily terminating Mother's and Father's parental rights to A.K. See Ind.Code § 31-35-2-8; Parks v. Delaware County Dep't of Child Servs., 862 N.E.2d 1275, 1278 (Ind.Ct.App.2007). But where, as here, the rights involved are of constitutional magnitude, our review cannot begin and end with the mere fact that applicable statutes do not require a trial court to support its conclusions with any identifiable rationale. An earlier panel of our court has opined that in light of the serious and permanent nature of termination of parental rights proceedings, a trial court's termination order should include the findings of fact and conclusions of law necessary to support its decision. See Parks, 862 N.E.2d at 1280-81 (stating that termination of parental rights is such a serious matter that appellate courts must be convinced the trial court based its judgment on proper considerations). We believe that a judgment terminating the relationship between a parent and child is impossible to review on appeal if it is nothing more than a mere recitation of the conclusions the governing statute requires the trial court to reach. Indiana's parents and children deserve more, and the basic notions of due process inherent in our system of justice demand more.
Trial courts are required by statute to enter findings of fact and conclusions of law in CHINS proceedings. See Ind.Code § 31-34-19-10 (2008). Likewise, findings of fact and conclusions of law are required in grandparent visitation proceedings. See Ind.Code § 31-17-5-6 (2008); K.I. ex rel. J.I. v. J.H., 903 N.E.2d 453, 462 (Ind.2009). Proceedings to terminate parental rights touch interests at least as fundamental as those regarding CHINS and grandparent visitation. We hold today that our trial courts must treat them accordingly, with the constitutional gravity they clearly have, and enter findings of fact that support the entry of the conclusions called for by Indiana statute and the common law.
We now turn to the arguments presented in this appeal. In order to involuntarily terminate a parent-child relationship, the State is required to allege and prove, among other things, that:
(B) there is a reasonable probability that:
(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or
(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;
(C) termination is in the best interests of the child; and
(D) there is a satisfactory plan for the care and treatment of the child.
Ind.Code § 31-35-2-4(b)(2)(B), (C), and (D) (2008). Each of these allegations must be established by clear and convincing evidence. Egly v. Blackford County Dep't of Pub. Welfare, 592 N.E.2d 1232, 1234 (Ind. 1992); see also Ind.Code § 31-35-2-8 (2008).
Mother and Father challenge the sufficiency of the evidence supporting the probate court's judgment as to subsection 2(B) of the termination statute cited above. See Ind.Code § 31-35-2-4(b)(2)(B). However, Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, and therefore, the court is required to find that only one prong of subsection 2(B) has been established by clear and convincing evidence. See L.S., 717 N.E.2d at 209. Accordingly, as to subsection 2(B), we address only whether the DCS proved that *221 continuation of the parent-child relationship poses a threat to A.K.'s well-being. We also address the parties' arguments that the DCS failed to prove that termination of their parental rights was in A.K.'s best interests.

A. Mother's Arguments

Mother argues that the trial court's decision to terminate her parental rights is not supported by sufficient evidence. On the date A.K. was determined to be a CHINS, Mother did not have custody of A.K. and was not allowed parenting time with A.K. "until such time as recommended by a licensed mental health professional, and further order of" the St. Joseph Superior Court. Appellant's App. p. 47. Also, Mother's parental rights to two other children had been terminated.
Mother did not remain in contact with the DCS consistently, including a lack of communication for nearly one year, which she claimed was due to illness. Mother attended narcotics anonymous meetings, and had completed a parenting class in 2005. However, she never completed a drug rehabilitation program and she tested positive for cocaine in August 2008. Also, because Mother suffers from bipolar disorder and schizophrenia, she is under the care of a mental health professional. Mother receives social security disability income, but has failed to maintain stable housing. Tr. pp. 51-53. Mother had no visitation with A.K. and has not seen the child in two years.
Mother argues that because she was making some progress toward her case plan, the probate court should have dismissed the DCS's termination petition and allowed the case plan to continue with the goal of family reunification. We disagree.
The DCS presented evidence that Mother is unable to remain drug free, manage her mental illness, and maintain stable housing. Moreover, Mother's lack of communication with the DCS and inability to meet the case plan requirements which would have allowed her visitation with A.K. demonstrates Mother's lack of interest in maintaining a relationship with A.K. This evidence is sufficient to support the conclusion that continuation of the parent-child relationship poses a threat to A.K.'s well-being.
This same evidence supports the conclusion that Mother is unable to adequately care for A.K. "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." Castro v. State Office of Family and Children, 842 N.E.2d 367, 374 (Ind.Ct.App.2006), trans. denied. "In other words, `although parental rights have a constitutional dimension, the law allows for their termination when parties are unable or unwilling to meeting their responsibility as parents.'" Id. (quoting In re S.P.H., 806 N.E.2d 874, 880 (Ind.Ct.App.2004)). For all of these reasons, we conclude that sufficient evidence supports the probate court's determination that termination of Mother's parental rights is in A.K.'s best interests.

B. Father's Arguments

Father also argues that the evidence was insufficient to support the termination of his parental rights. First, we address Father's argument that DCS caseworker Michelle Johnson-Mastin's opinion that Father denies his substance abuse problem and has not demonstrated that he can stay clean from drugs and alcohol is speculative and not supported by the evidence.
Father was ordered to undergo a substance abuse evaluation, but "mental *222 health issues prevented him from doing" so. Tr. p. 59. Therefore, a new referral was made for a psychiatric evaluation at the Madison Center. Father participated in the psychiatric evaluation, but the results had not been received on the date of the termination hearing. Id. Father complied with some, but not all, random drug screens. Id. The DCS presented minimal evidence that Father has substance abuse problems. From the record, it appears that Father tested positive for marijuana in September 2008. Tr. p. 194. This evidence, and the fact that Father failed to take two random drug screens, was the only evidence presented that would support an inference that Father has a substance abuse problem. Father was ordered to attend Alcoholics Anonymous or Narcotics Anonymous, but failed to do so. From this evidence, we conclude that the DCS did prove that Father uses illegal substances, at least on occasion, and therefore, his refusal to participate in Alcoholics Anonymous or Narcotics Anonymous reflects poorly on his stated goal of reunification with A.K.
In his response to Judge Nemeth's revised final order, Father argues that several of the court's findings of fact are not supported by the evidence. Specifically, Father challenges the following findings: 1) "Mother, [F]ather and child had been living in a van for four (4) days at the time of detention;" 2) "Father does not have a steady job or home of his own;" 3) Father did not complete parenting and domestic violence classes; 4) Father did not interact well with A.K. during visits and did not bond with A.K.; and, 5) A.K. has been seeing a therapist for sexual problems and has problems with defecating and bedwetting which are related to trauma, possibly from sexual abuse.
We agree that the finding that Father does not have stable housing is not supported by the evidence. Father has resided in his mother's and stepfather's home for several years. Pictures of the home were admitted into evidence. Although Father's name is not on the deed of the home, there is no evidence in the record that would support an inference that Father lacks stable housing. However, there is no evidence in the record that Father has a steady job, although Father did testify that he receives social security disability income.
Concerning Father's bond with A.K., the service providers generally testified that there was some type of bond between A.K. and Father. Therefore, to the extent that the finding can be read to mean that there is no bond between Father and A.K., it is not supported by the evidence. However, the record does support the inference that the bond between Father and A.K. is not a parent-child bond. Further, the trial court's finding that Father did "not interact well" with A.K. is supported by the testimony of family consultant Mandy Garver, which is discussed in greater detail below. Tr. p. 116.
The record suggests that A.K. has suffered some trauma, possibly sexual abuse. However, there is no evidence in the record that Father has sexually abused A.K. other than Mother's allegation that Father molested her, which Mother later recanted. When A.K. was detained, medical personnel found no evidence of sexual abuse. Therapist Cynthia Biskner also testified that she has not seen any evidence that would lead her to conclude that either parent sexually abused A.K. Ex. Vol., DCS Ex. 12; Tr. p. 104. We agree with Father's assertion that the record lacks clear and convincing evidence that either parent sexually abused A.K.
While he was in jail in Texas, Father completed a parenting class. Tr. p. 56. However, DCS caseworker Michelle *223 Johnson-Mastin testified that when Father returned to Indiana he was ordered to complete a domestic violence class, and complete a parenting class, even though he had completed one while incarcerated. Tr. pp. 55-56. Johnson-Mastin further testified that Father did not complete those Indiana classes, and therefore, the trial court's findings concerning domestic violence and parenting classes are supported by the evidence.
Father has complied with some of the case plan requirements since his return to Indiana. Father actively participated in family therapy and visitation with A.K. Amy Seipel, the family therapist, stated that Father "has been working hard in family sessions." Ex. Vol., Respondent's Ex. E. "He has also been trying to find ways to connect with [A.K.] through various activities and toys." Id. Seipel also observed that A.K. appears excited to see Father, is "appropriately physically affectionate toward" Father, and "has commented on her love for him while in sessions." Id. Seipel also noted A.K.'s strong attachment to her foster family and opined that A.K. is likely experiencing anxiety "at the thought of having to leave her foster home and the strong bonds that she has there." Id. Ultimately, Seipel concluded:
[Father] has been trying hard in family sessions to bond with [A.K.]. It would be possible to work with [Father and A.K.] on building their level of attachment in future family sessions. There is no way to predict how long it would take for [A.K.] to be ready to return to her biological home, but it would not be a short process. While each child responds differently to the reunification process, [A.K.] appears to be secure in her attachment to her foster family and to be struggling with the idea of reuniting with her father. This internal conflict seems to result in increased anxiety and behavioral problems that would not be expected to decrease until [A.K.] has completely acclimated in a permanent placement, whether that is with her biological father or her foster family.
Id.
The CASA also testified that A.K. will climb onto father's lap during visitation and states that she loves Father. Tr. p. 19. However, both the CASA and family consultant Mandy Garver stated that A.K. has indicated that she is afraid of Father. Tr. pp. 19, 123. A.K.'s behavioral problems also escalate after she has had visitation with Father. Tr. p. 95. Garver believes that A.K.'s level of anxiety has increased as visitation with Father continues. Tr. p. 123. A.K.'s foster mother testified that after visitation with Father, A.K. acts aggressively, has nightmares, does not sleep well, and urinates in odd places. Tr. p. 141. Therapist Cynthia Biskner testified that she asked for Father's visitation with A.K. to be decreased because of A.K.'s "continual acting out around the visits." Tr. p. 97. Biskner stated that if reunification efforts continued between Father and A.K. it would be a "major interruption" in the progress A.K. has made both cognitively and emotionally. Tr. pp. 99-100.
Garver observed visitations between A.K. and Father, and she testified that Father rarely interacted with A.K., but would either spend the time talking to Garver or just observing A.K.'s play. Tr. p. 116. Garver also stated that while there is a bond between A.K. and Father, "it is a bond she would have with anybody that came to visit with her because the person is paying attention to her." Tr. p. 118.
A.K.'s developmental delays and poor hygiene on the date she was taken into DCS custody suggests that Father did not know how to properly care for A.K. Father was ordered to complete additional *224 parenting classes, but failed to do so. Father still has not demonstrated that he has the knowledge to properly care for A.K. Ex. Vol., DCS Exhibit 10. Moreover, the evidence supports the trial court's finding that A.K. fears Father. A.K. has expressed her fear of Father and her behavioral problems escalate after visitation with Father. Father's continued relationship with Mother is also problematic. See tr. p. 214. For all of these reasons, we conclude that the DCS presented clear and convincing evidence that continuation of the parent-child relationship poses a threat to A.K.'s well-being.
Termination of Father's parental rights is also in A.K.'s best interests. In determining what is in the best interests of the child, the trial court is required to look at the totality of the evidence. In re D.D., 804 N.E.2d 258, 267 (Ind.Ct.App. 2004), trans. denied. In doing so, the trial court must subordinate the interests of the parents to those of the child involved. Id. Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. In re R.S., 774 N.E.2d 927, 930 (Ind.Ct.App. 2002), trans. denied. The trial court need not wait until the child is irreversibly harmed such that her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. Id. Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests. McBride v. Monroe County Office of Family & Children, 798 N.E.2d 185, 203 (Ind.Ct.App.2003); see also In re G.Y., 904 N.E.2d 1257, 1265 (Ind.2009) ("Permanency is a central consideration in determining the best interests of a child.").
Father's familial bond with A.K. is tenuous, and he has not demonstrated an ability to parent the child. This is reflected in A.K.'s condition at the time of detention, Father's failure to continue to take parenting classes as ordered, and Father's lack of interaction with A.K. during visitations. Although A.K. still has behavioral issues, her behavior has improved except after visitation with Father, whom she fears. A.K. requires stability that Father cannot provide. Although the family therapist noted Father's improvement in attempting to form an attachment with A.K., she also stated that if reunification were to occur, it would be a lengthy process. Moreover, the continuation of reunification efforts would disrupt the progress A.K. has made both emotionally and cognitively. For all of these reasons, we conclude that termination of Father's parental rights is in A.K.'s best interests.
Finally, we reject Father's argument that the DCS failed to prove that there is a satisfactory plan for the care and treatment of the child. The DCS proved that the foster parents have filed a petition to adopt A.K. On the date of the termination hearing, A.K. had resided with the foster family for almost two years. The evidence also established that A.K. has a strong bond with her foster family and that her interaction with her foster mother is "excellent." Tr. p. 100.

Conclusion
Clear and convincing evidence supports the trial court's judgment terminating Mother's and Father's parental rights to A.K.
Affirmed.
DARDEN, J., and ROBB, J., concur.
NOTES
[1] The DCS failed to file an appellee's brief in this appeal.