## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 02 2015, 8:32 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Mark Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re the Involuntary Termination of the Parent-Child Relationship of: | December 2, 2015 |
| Au.R. and Ay.R. (Minor Children) | Court of Appeals Case No. 54A05-1506-JT-743 |
| and | Appeal from the Montgomery Circuit Court |
| R.W. (Mother), | The Honorable Harry A. Siamas, Judge |
| *Appellant-Respondent,* | Trial Court Cause Nos. 54C01-1501-JT-18 54C01-1501-JT-19 |
| v. | |
| Indiana Department of Child Services, | |
| *Appellee-Petitioner.* | |

**Mathias, Judge.**

[1]   R.W. ("Mother") appeals the order of the Montgomery Circuit Court terminating her parental rights to her two minor children, Au.R. ("Son") and Ay.R. ("Daughter"). On appeal, Mother presents two issues: (1) whether the trial court erred in admitting testimony of an Indiana Department of Child Services ("the DCS") caseworker that, in her opinion, Mother posed a threat to the wellbeing of the children; and (2) whether the trial court's decision to terminate Mother's parental rights was supported by sufficient evidence.

[2]   We affirm.

## Facts and Procedural History

[3]   As Mother does not challenge the trial court's findings of fact, we set forth the facts as found by the court:

> 1.    [Daughter] was born [in] 2004. [Son] was born [in] 2008. Their parents are [Mother] and A.R. A.R. was murdered in August 2012.
>
> 2.    On December 9, 2013, the DCS were called to the Riviera Motel in Crawfordsville to assist Crawfordsville police. The police were investigating a counterfeiting operation at that location. [Mother] and her boyfriend J.M. had been living at the motel for about three weeks along with [Daughter] and [Son]. [Daughter and Son] had not been attending school. The motel room was filled with boxes of merchandise which had been purchased with counterfeit money. A large amount of counterfeit money was found in the motel room. The children's clothes were in Tupperware tubs. Drug paraphernalia for methamphetamine use was found in the motel room and some drug paraphernalia

was found mixed in with the children's clothes. Methamphetamine, heroin, hashish and Suboxone was found in the motel room. The children had head lice. The children were fearful. [Mother] had been using methamphetamine and heroin daily for at least six weeks prior to December 9, 2013. She was smoking methamphetamine in the motel bathroom with the children in the next room when the police knocked on the door of the room on December 9th. She tested positive for methamphetamine when given a drug test. [Mother] had sores on her body and was under the influence of methamphetamine on December 9th.

3.     The DCS had done previous investigations of [Mother] and her care of the children. In January 2011, [Mother] was found unresponsive from a drug overdose in her home in Marion County. The children were present at the time.

4.     [Mother] has a history of abusing controlled substances. She had treatment at Harbor Lights for two or three months and was able to maintain sobriety for a period of time before relapsing into illegal drug use again.

5.     [Mother] was convicted of possession of methamphetamine, a class B felony and forgery a class C felony in July 2014. She received a ten year sentence for the possession of methamphetamine conviction. Five years of the sentence were executed and five years were suspended. She received a four year sentence for the forgery conviction. All four years were suspended. At the time of the termination hearing, [Mother] was incarcerated at the Indiana Department of Correction[] for these convictions. [Mother]'s earliest release date is either December of 2015 or February 2016 depending on sentence cuts she may receive for completion of programs in IDOC. [Mother] has pending criminal charges in Boone County that she believes will be resolved by plea agreement.

6.     On December 9, 2013, the DCS took both children into protective custody and placed them with their maternal

grandmother. The children have been removed from their mother who was the custodian of both children from that date to the date of the hearing on the petition to terminate [Mother]'s parental rights.

7. On December 11, 2013, the DCS filed its "Verified Petition Alleging Child in Need of Services" as to both [Daughter] and [Son].

8. On January 28, 2014, a fact finding hearing was held and the Court adjudicated both children to be in need of services.

9. On February 24, 2014, the Court held a dispositional hearing. The Court ordered that both children were made wards of the DCS. The children continued in their placement with their maternal grandmother and her husband. The Court ordered the children to have a mental health evaluation. No services were offered to [Mother] since she was in jail.

10. The children have remained in placement with their maternal grandmother and her husband since December 9, 2013.

11. On June 16, 2014, a review hearing was held by the court. The Court ordered that the children continue to be placed with their maternal grandmother with services offered to the children that included mental health counseling through Cummins Mental Health. No services were offered to [Mother] since she was incarcerated in jail.

12. On December 5, 2014, the court held a permanency hearing. The children's placement and counseling services were continued. The Court ordered that the permanency plan be changed to a concurrent plan of reunification and adoption.

13. [Daughter] suffers from post traumatic stress disorder and episodic depressive disorder. [Daughter]'s removal from her mother is the traumatic event that causes her PTSD. She receives weekly therapy for these conditions.

14.   [Son] suffers from post traumatic stress disorder and reactive attachment disorder. His PTSD is caused by his father's death, removal from his mother and the stress caused by prison visits with his mother. [Son] has outbursts at school that are getting worse. These outbursts occur around the time of his prison visits with this mother. [Son] was not nurtured prior to his removal from his mother. He is bonded with his grandmother. [Son] receives weekly therapy for these mental health issues. [Son] will be held back in his current school grade.

15.   Both children need the stability and support that they currently receive in their grandmother's home. The children have lived with their maternal grandmother prior to December 2013. They lived with her from May 2012 to January 2013. When [Son] was two years old he lived with maternal grandmother for two months while [Mother] and his father were in drug rehab.

16.   The DCS plan post termination is adoption of the children. While maternal grandmother does not believe termination of [Mother]'s parental rights is in the best interests of the children, she would adopt them both . . . if necessary. [Grandmother] and her husband are in their 60's and she is concerned about both their advanced age to adopt and the financial burden that adoption might cause herself and her husband.

17.   [Mother] is participating in substance abuse and parenting programs while she is incarcerated. She has received minor misconduct reports while she is incarcerated. She plans to live with a cousin upon her release from IDOC. She wants to reunite with her children.

Appellant's App. pp. 5-8.

[4]     As noted by the trial court, the DCS filed its petition alleging that the Children were in need of services ("CHINS") on December 11, 2013. The trial court held a detention hearing on December 11, 2013, and ordered the children to be

placed with their maternal grandmother ("Grandmother"). The court found the Children to be CHINS after a January 24, 2014 factfinding hearing. At the dispositional hearing held on February 24, 2014, the trial court ordered Mother to contact DCS for services upon her release from incarceration. The court also ordered the Children to have visitation with Mother while she was incarcerated.

As of the June 14, 2014, review hearing, the court determined that Mother had not improved her parenting abilities and that she could not participate in services due to her continued incarceration. Then, at the December 5, 2014, permanency hearing, the trial court approved of a concurrent plan of reunification and adoption.

On January 23, 2015, the DCS filed petitions to terminate Mother's parental rights to the Children. The trial court held an evidentiary hearing on the matter on May 28, 2015. On June 23, 2015, the trial court issued its findings of fact and conclusions of law, ordering that Mother's parental rights be terminated. Mother now appeals.

## Termination of Parental Rights

"The purpose of terminating parental rights is not to punish parents but to protect their children. Although parental rights have a constitutional dimension, the law allows for their termination when parties are unable or unwilling to meet their responsibility as parents." *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004) (citation omitted). Indeed, parental interests "must be subordinated

to the children's interest[s]" in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009).

[8] Indiana Code section 31-35-2-4(b) provides that a petition to terminate parental rights must meet the following relevant requirements:

> (2) The petition must allege:
>
> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

[9] Section 31-35-2-4(b)(2)(B) is written in the disjunctive; therefore, the trial court is required to find that only one prong of subsection 2(b)(2)(B) has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010). The DCS must prove "each and every element" by clear and convincing evidence. *G.Y.*, 904 N.E.2d at 1261; Ind. Code § 31-37-14-2. Clear and convincing evidence need not establish that the continued custody of the parents is wholly inadequate for the child's very survival. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). Rather, it is

sufficient to show by clear and convincing evidence that the child's emotional development and physical development are put at risk by the parent's custody. *Id*. If the court finds that the allegations in a petition are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

## I. Admission of Evidence

[10] Mother first argues that the trial court erred in the admission of certain testimony. In addressing this argument, we observe that questions regarding the admission of evidence are left to the sound discretion of the trial court, and we will not reverse that decision except for an abuse of that discretion. *In re the Involuntary Termination of the Parent Child Relationship of A.H.*, 832 N.E.2d 563, 567 (Ind. Ct. App. 2005), *trans. denied*. An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before it. *Id*.

[11] Here, Mother takes issue with the admission of certain testimony from DCS case manager,[1] Itzayno Prieto ("Prieto"). Prieto testified that she had an Associate's degree in "pub science and criminal justice" and a Bachelor's Degree in liberal arts from Purdue University, with "some of her background . . . in child development and psychology, sociology." Tr. p. 86. When asked if she thought Mother posed a threat to the Children's well being, Mother's counsel

---

[1] Prieto testified that her current title is "permanency worker," which used to be referred to as a family case manager or ongoing case manager.

objected based on Prieto's lack of education and expertise in evaluating threats. The trial court overruled the objection, and Prieto testified that Mother was a threat to the Children's well being because:

> Again, this was a conscious decision by [Mother]. We did not land her here. Her actions landed her in a situation. She is incarcerated because of the consequences of her actions. She knowingly put her children in that situation with the paraphernalia in their clothes; she knowingly, willingly did that. She could have made arrangements for her children, but she did not. So we had to step in and we have been overseeing the care, control and placement of her children this whole time.

Tr. pp. 95-96.

[12] On appeal, Mother claims that this evidence should have been excluded under Indiana Evidence Rule 701. This rule provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>     (a) rationally based on the witness's perception; and
>     (b) helpful to a clear understanding of the witness's testimony or to a determination of a fact in issue.

[13] Mother argues that Prieto's testimony was not based on her own observations of Mother and therefore fails under subsection 701(a). Mother notes that the Children were removed from her care in December 2013, whereas Prieto was not assigned to the case until June 2014. She also notes that Prieto only spoke with Mother twice, once briefly in a holding room and once over the telephone. She also claims that the testimony was inadmissible because it was not helpful

to a clear understanding of the witness's testimony or to a determination of a fact at issue.

[14] However, even if we assume *arguendo* that the testimony was inadmissible, its admission was at most harmless error. The improper admission of evidence is harmless error when the trial court's judgment is supported by substantial independent evidence to satisfy the reviewing court that no substantial likelihood exists that the questioned evidence contributed to the judgment. *B.H. v. Indiana Dep't of Child Servs.*, 989 N.E.2d 355, 363 (Ind. Ct. App. 2013).

[15] Mother claims that Prieto's testimony was prejudicial to her because the testimony specifically addressed one of the factors the DCS had to establish, i.e. whether a reasonable probability exists that the continuation of the parent-child relationship poses a threat to the well being of the child. *See* I.C. § 31-35-2-4(b)(2)(B).

[16] The trial court, however, did not base its termination decision on a finding of a threat to the well being of the Children. As noted above, the termination statute is written in the disjunctive and the trial court is required to find that only one prong of subsection 2(b)(2)(B) has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.2d at 220. The trial court here based its termination decision on its conclusion a reasonable probability exists that the conditions that resulted in the children's removal would not be remedied, not on a conclusion that Mother poses a threat to the well being of the children. *See* Appellant's App. p. 10.

Because the trial court did not terminate Mother's parental rights based upon the "threat" prong of subsection 2(b)(2)(B), the admission of Prieto's testimony regarding her opinion that Mother posed a threat to the well being of the Children was at most harmless error. *See B.H.*, 989 N.E.2d at 363 (concluding that erroneous admission of progress reports into evidence was harmless where the trial court's termination order did not reference the reports or their content).

## II.  Sufficiency of the Evidence

Mother also claims that the trial court's decision to terminate her parental rights was not supported by sufficient evidence. We have a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh the evidence nor assess witness credibility. *Id.* We consider only the evidence favorable to the trial court's judgment and the reasonable inferences to be drawn from this evidence. *Id.* Where, as here, the trial court enters findings of fact and conclusions of law in its termination of parental rights,[2] we apply a two-tiered standard of review. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.* We first determine whether the evidence supports the findings; we then determine whether the findings support the judgment. *Id.* Findings are clearly erroneous only when the record contains no

---

[2]  Although trial courts are not statutorily required to enter findings of fact and conclusions of law when terminating parental rights, we have nevertheless held that, given the constitutional import of such a decision, trial courts *must* "enter findings of fact that support the entry of the conclusions called for by Indiana statute and the common law" when issuing an order terminating parental rights. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010).

facts to support them either directly or by inference. *Id.* If the evidence and inferences support the trial court's decision, we must affirm. *Id.* Likewise, we will set aside the trial court's judgment terminating a parent-child relationship only if it is "clearly erroneous." *Id.* In this context, "clear error" is that which "leaves us with a definite and firm conviction that a mistake has been made." *Id.* (quoting *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004)).

[19]   Here, Mother contends that the DCS failed to meet its burden with regard to the elements set forth in Indiana Code section 31-35-2-4(2)(B)(2) and (C). We address both of these arguments in turn.

### A.  Conditions That Led to the Children's Removal

[20]   The trial court concluded that a reasonable probability exists the conditions which led to the Children's removal were unlikely to be remedied. When making a determination as to whether a reasonable probability exists that the conditions resulting in a child's removal or continued placement outside of a parent's care will not be remedied, the trial court must judge a parent's fitness to care for her child at the time of the termination hearing while also taking into consideration evidence of changed circumstances. *A.D.S.*, 987 N.E.2d at 1156-57. The trial court is also required to consider the parent's habitual patterns of conduct in order to determine the probability of future neglect or deprivation of the child. *Id.* at 1157. The trial court may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* The trial court may

also consider the services offered to the parent by the DCS and the parent's response to those services as evidence of whether conditions will be remedied. *Id*. The DCS is not required to provide evidence ruling out all possibilities of change. *Id*. Instead, it needs to establish only that a "reasonable probability" exists that the parent's behavior will not change. *Id*.

[21] Considering only the facts favorable to the trial court's judgment, we cannot say that the trial court clearly erred in determining that a reasonable probability exists that Mother's behavior would not change. Mother was thirty-seven years old at the time of the termination hearing and has a long history of substance abuse, beginning when she was only fifteen years old. Throughout her adult life, Mother has abused cocaine, opiates, and methamphetamine. Importantly, most of Mother's drug use occurred after her children were born. Mother's drug use led to the DCS becoming involved in 2011, when Mother overdosed and the Children first lived with their Grandmother. Although Mother sought treatment after the overdose and temporarily maintained sobriety, she began using again. When the Children returned to Mother's care, Grandmother was so concerned that she contacted the DCS regarding her daughter's drug use. Shortly thereafter, the DCS was called to the scene where Mother was using methamphetamine in a hotel room containing drug paraphernalia, counterfeiting equipment, and counterfeit cash. Some of the paraphernalia was even stored with the Children's clothing. In fact, Daughter was even able to direct the police to where Mother kept her drugs.

On appeal, Mother refers us to her testimony in which she claimed to have participated in services while incarcerated and to Grandmother's testimony that Mother had changed. The trial court in fact considered Mother's participation in services while incarcerated. However, upon reviewing Mother's past behavior, the court came to the conclusion that a reasonable probability exists that Mother's drug abuse problem would continue. Under the facts and circumstances of this case, we cannot say that this conclusion was clearly erroneous.

## B. Best Interests of the Children

Mother also challenges the conclusion of the trial court that termination of her parental rights is in the best interests of the Children. In determining what is in the best interests of a child, the trial court must look beyond the factors identified by the DCS and look to the totality of the evidence. *A.D.S.*, 987 N.E.2d at 1158. In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* The court need not wait until the children are irreversibly harmed before terminating the parent-child relationship. *Id.* A recommendation by both the case manager or child advocate to terminate parental rights is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id.* at 1158-59. Permanency is a central consideration in determining the best interests of a child. *Id.* at 1159.

Here, Prieto and the court-appointed special advocate ("CASA") both testified that termination of the parent-child relationship would be in the Children's best interests. The CASA explained that the Children needed a stable and secure

home environment. Also, the Children's therapist testified that both Children needed stability, which they had obtained in Grandmother's care.

[25] Mother's arguments are again little more than a request that we consider the evidence not favorable to the trial court's decision, reweigh the evidence, and come to a conclusion opposite that reached by the trial court. However, this is not our role as an appellate court. *See In re D.B.*, 942 N.E.2d at 871. The facts most favorable to the trial court's decision show that the Children were removed from Mother's care in December 2013. Mother's earliest possible release date is in December 2015. However, at the time of the termination hearing, Mother was also facing pending charges in Boone County. Although Mother believed that these charges would be resolved by a plea agreement, this had not yet happened, and no evidence in the record indicates what sentence Mother will receive in that case. In short, at the time of the hearing, the Children had already been removed from Mother's care for approximately a year and a half. Mother's argument would have us keep the Children in the limbo of foster care for at least another six months, and quite possibly longer, despite the evidence regarding the Children's need for stability.

[26] Further, evidence indicates that the Children were neglected while in Mother's care. Indeed, Son was diagnosed with attachment disorder, which is mostly seen in children who are not nurtured at a young age. Son has also had outbursts that occurred when he visited Mother in prison. The Children are bonded to Grandmother, who also provided care for them at an earlier point in their lives when Mother was in drug therapy. In Grandmother's care, the

Children receive weekly therapy to assist them with their mental health and behavioral issues. Grandmother, although she did not wish to see Mother's parental rights terminated, testified that she would be willing to adopt the Children, if necessary.[3]

[27] Again, based on the facts and circumstances of the present case, we are unable to conclude that the trial court clearly erred in concluding that termination of Mother's parental rights was in the Children's best interests.

## Conclusion

[28] The trial court's admission of the testimony regarding Mother being a threat to the well being of the Children was at most harmless error because the trial court did not base its termination decision on this factor. Also, the trial court's decision to terminate Mother's parental rights is based on sufficient evidence.

[29] Affirmed.


Baker, J., and Bailey, J., concur.

---

[3] Mother makes no argument regarding a satisfactory plan for the care and treatment of the Children. *See* I.C. § 31-35-2-4(b)(2)(D). Even if she did, the plan for adoption is a satisfactory plan. *See In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014), *trans. denied*.