# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 03 2018, 6:09 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Patrick Magrath
Alcorn Sage Schwartz &
Magrath, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of:

O.W. (Minor Child),

and

T.W. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

May 3, 2018

Court of Appeals Case No.
40A01-1712-JT-2860

Appeal from the Jennings Circuit Court

The Honorable Jon W. Webster, Judge

Trial Court Cause No.
40C01-1612-JT-66

**Baker, Judge.**

[1] T.W. (Father) appeals the trial court's order terminating his relationship with his daughter, O.W. (Child). Father argues that there is insufficient evidence supporting the trial court's conclusion that termination is in Child's best interests. Finding the evidence sufficient, we affirm.

# Facts

[2] Child was born to her Mother and Father in March 2005. On April 12, 2015, Mother died. At that time, Child lived with Mother and her husband, but after Mother's death, Child's stepfather was unable or unwilling to continue to care for Child. Father had little to no relationship with Child at the time of Mother's death; indeed, he had not seen Child in several years. As a result, on May 19, 2015, the Department of Child Services (DCS) filed a petition alleging that Child was a child in need of services (CHINS).

[3] Father admitted that he had little to no relationship with Child and that he had alcohol abuse and mental health issues that prevented him from being a safe and appropriate caregiver at that time. Based on those admissions, the trial court found Child to be a CHINS on May 29, 2015. On August 14, 2015, the trial court entered a dispositional decree, ordering that Father participate in the following services: complete a parenting assessment, substance abuse assessment, and psychological evaluation, and comply with any recommendations stemming from those assessments; submit to random drug

screens; meet with medical or psychiatric personnel and take all medication as directed; and attend supervised visitation with Child.

[4] In June 2015, Father completed a substance abuse assessment, which recommended that he participate with intensive outpatient therapy (IOT) and individual psychotherapy. He never participated with IOT. He completed a psychological evaluation, which led to diagnoses of mild intellectual disability and alcohol and cannabis dependence.

[5] In November 2015, Father completed a parenting assessment. The assessor concluded that Father "would have difficulty meeting his daughter's on-going developmental needs as well as providing a safe and nurturing environment that would facilitate growth and learning." DCS Ex. 8 p. 7. She was also concerned that Father would be unable to grasp concepts sufficiently to enable him to perform parental tasks without supervision. The assessor made the following recommendations: (1) Father needed to make "substantial improvements" to his home environment; (2) he needed "extensive help learning appropriate parenting skills" and would also need ongoing parenting support and direction; (3) he should complete a mental health evaluation and participate in individual therapy; and (4) he should participate with substance abuse treatment. *Id.* at 7-8.

[6] On January 7, 2016, Child, who has significant behavioral issues and hears voices, completed a psychological evaluation. The psychologist diagnosed Child with reactive attachment disorder, other specific schizophrenia spectrum,

and other psychotic disorder with persistent auditory hallucinations. It was recommended that Child participate in individual therapy and see a psychiatrist to explore medication possibilities.

[7] Partially because of Child's significant issues, she has had to change placements frequently during the underlying proceedings. She was initially placed with her maternal grandfather, then placed with her maternal aunt and uncle, then placed in foster care and, after that first placement ended, was placed with another foster family (Foster Parents).

[8] In October 2016, after Child was moved from relative care into foster care, she began seeing Debra Garrett for individual therapy. At that time, Child struggled with attachment issues, had imaginary friends, was afraid that Father would resume using drugs and alcohol, struggled with grief, and exhibited behavioral issues, including physical aggression. Garrett recommended that Child continue to participate in individual therapy and that Child and Father participate in family therapy. Garrett believes that Child "requires an environment that demands structure and consistency for her to be successful." Tr. Vol. II p. 7. Child has made significant progress since she began participating regularly with therapy.

[9] Also in October 2016, Father stopped participating in services consistently and disclosed that he had been drinking alcohol and smoking marijuana. On October 20, 2016, Father tested positive for THC. That is the only drug screen he agreed to submit to throughout the entirety of the case. *Id.* at 60-61.

[10] Garrett supervised the visits between Father and Child. Initially, the visits were in Father's home and lasted for three hours. But three hours seemed too long, as both Child and Father wanted to leave early and they did not interact very much. Thereafter, they were reduced to two and one half, and then to two, hours in length. At some point, Father disclosed that he had marijuana in his home but would not tell DCS where it was so that it could be ensured that Child could not find it; after that, his visits were held in an office or out in the community. At times during visits, Father told Garrett that he had been using marijuana and drinking alcohol. On one occasion, he reported that he did not have enough money for groceries but had spent $25 on marijuana. Child expressed that she did not want to live with Father because she was worried he would resume his drug and alcohol use, requested full supervision at all visits, and exhibited emotional behaviors before and after visits.

[11] On December 21, 2016, DCS filed a petition to terminate the parent-child relationship between Father and Child.

[12] In January 2017, Father was referred to Garrett for therapy, but during his first session, he was adamant about refusing to participate. Therefore, that referral was unsuccessfully closed.

[13] In August 2017, Father admitted that he had been drinking beer and vodka, he had been arrested for public intoxication, and on one occasion, had been drinking with friends when one of those friends put a gun to Father's head.

Following these incidents, he increased his attendance at Alcoholics Anonymous, but continued to refuse to attend IOT.

[14] The termination hearing took place on September 19, 2017. At that time, Child had been placed with Foster Parents for three to four months and was doing well. Foster Parents provided Child with a structured environment and were very involved with her school to ensure that her special needs were being met. Foster Parents were open to the possibility of adopting Child, though they had not made a final decision in that regard. The Family Case Manager (FCM), Guardian ad Litem (GAL), and Garrett all testified that termination of Father's parental rights was in Child's best interests. Father conceded that he was unable to care for Child and that it was in her best interests to remain placed with Foster Parents. Child has consistently indicated throughout the case that she does not want to live with Father, that she does not want unsupervised contact with Father, and that she wants to continue living with Foster Parents. On October 18, 2017, the trial court granted DCS's petition to terminate the parent-child relationship. Father now appeals.

## Discussion and Decision

## I. Standard of Review

[15] Our standard of review with respect to termination of parental rights proceedings is well established. In considering whether termination was appropriate, we neither reweigh the evidence nor assess witness credibility. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We will

consider only the evidence and reasonable inferences that may be drawn therefrom in support of the judgment, giving due regard to the trial court's opportunity to judge witness credibility firsthand. *Id.* Where, as here, the trial court entered findings of fact and conclusions of law, we will not set aside the findings or judgment unless clearly erroneous. *Id.* In making that determination, we must consider whether the evidence clearly and convincingly supports the findings, and the findings clearly and convincingly support the judgment. *Id.* at 1229-30. It is "sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005).

[16] Indiana Code section 31-35-2-4(b)(2) requires that a petition to terminate parental rights for a CHINS must make the following allegations:

(A)     that one (1) of the following is true:

(i)     The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii)     A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii)     The child has been removed from the parent and has been under the supervision of a local office or

probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

    (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.*, 989 N.E.2d at 1230.

## II. Best Interests

[17] Father's sole argument on appeal is that the evidence does not support the trial court's conclusion that termination is in Child's best interests. In evaluating

what is in a child's best interests, the court must consider the totality of the evidence, subordinating the interests of the parent to that of the child. *In re A.K.*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010); *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *J.S.*, 906 N.E.2d at 236.

[18] Over two years passed between the opening of the CHINS case and the termination hearing. Despite all that time, Father had to concede at the termination hearing that he was still unable to care for Child, given both his and her special needs. Moreover, although they had participated in years of supervised visitation, there had been little to no improvement in their relationship. Indeed, Child did not want any unsupervised visits with Father, much less to be placed with him. And although it was repeatedly recommended that Father participate with individual therapy and substance abuse treatment, he refused to take part in either service and used drugs and alcohol throughout much of the underlying proceedings.

[19] Father argues that the trial court should have ordered that Child be placed in a permanent guardianship with Foster Parents rather than the final remedy of termination. Both Garrett and the FCM testified, however, that it would be better for Child to achieve permanency and stability through termination rather than continue to live in an impermanent "limbo" of guardianship. Tr. Vol. II p. 31-32, 66. The GAL also opined that termination would be in Child's best interests. *Id.* at 86. We find that this testimony, together with the underlying

facts in the record, support the trial court's conclusion that termination is in Child's best interests.

[20] The judgment of the trial court is affirmed.

Kirsch, J., and Bradford, J., concur.