## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 27 2018, 9:13 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Karen M. Heard
Vanderburgh County Public Defender's Office
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of L.M. (Child) and G.J. (Mother) and A.M. (Father); | August 27, 2018 |
| | Court of Appeals Case No. 18A-JT-619 |
| G.J (Mother) and A.M. (Father), | Appeal from the Vanderburgh Superior Court |
| *Appellants-Respondents,* | |
| v. | The Honorable Brett J. Niemeier, Judge |
| The Indiana Department of Child Services, | Trial Court Cause No. 82D04-1708-JT-1484 |
| *Appellee-Plaintiff* | |

**May, Judge.**

G.J. ("Mother") and A.M. ("Father") (collectively "Parents") appeal the involuntary termination of their parental rights to L.M. ("Child"). Parents argue the Department of Child Services ("DCS") did not present sufficient evidence the conditions resulting in Child's removal would not be remedied, the continuation of the parent-child relationship posed a threat to Child, and termination was in the best interest of Child. We affirm.

## Facts and Procedural History

Mother and Father are the biological parents of Child born February 4, 2016. On March 4, 2016, Parents were homeless and received housing through Aurora's Vision 1505 program.[1] Sierra Riordan was assigned as Parents' case manager at Vision 1505. Because Child's weight was fluctuating, a Vanderburgh County public health nurse was also assigned to monitor Child's situation.

Throughout Parents' relationship, Mother had alleged domestic violence but then recanted her allegations. In 2015, Mother requested a No Contact Order

---

[1] Aurora is an organization that assists the homeless. http://auroraevansville.org/mission/ (last visited August 13, 2018). Vision 1505 provides one to three bedroom housing for "homeless families determined to have severe housing barriers." http://auroraevansville.org/services/vision-1505/ (last visited August 13, 2018).

("NCO") but then requested it be lifted. Mother alleged Father had raped her and obtained another NCO, but Mother again had it dismissed.

[4] On March 30, 2016, during an altercation between Parents, Father threw a baby bottle at Mother when she was holding Child. The bottle bounced off Mother and hit Child in the face. Parents took Child to the emergency room. Personnel at the emergency room filed a report with DCS.

[5] DCS filed a petition to adjudicate Child as a Child In Need of Services (CHINS) on April 4, 2016. Child was allowed to remain with Mother, but Father's access to Child was restricted. Parents did not agree with this restriction. In addition, due to the domestic violence, Father was banned from all Aurora property, including Vision 1505 where Mother and Child lived. The court issued another NCO, but Parents violated it by spending time together.

[6] On April 13, 2016, the trial court held an initial hearing on DCS's petition. Parents admitted Child was CHINS and Child was adjudicated as such. Child was allowed to stay with Mother if Parents complied with DCS. Later that day, DCS removed Child from Mother's care after a Child and Family Team Meeting ("CFTM") wherein Parents challenged DCS's method of implementing the court's orders. The trial court confirmed the removal on

April 14, 2016. (Ex. Vol. IV at 202.)[2] Family Case Manager Maximilian Lisenbee ("FCM Lisenbee") from DCS was assigned to the family.

[7] On May 23, 2016, the trial court entered its dispositional decree ordering Parents to participate as agreed in the Parental Participation Plan; to submit to psychiatric and psychological testing; and to attend scheduled visitation. Mother was also ordered to submit to an assessment with Guardianship Services of Southwestern Indiana and to complete parenting classes. Father was ordered to have an "intensive parent aide [to assist] with housing and parenting one on one[,]" (*id.* at 209); to obtain a mental health assessment; to participate in the Amends[3] program; to "participate in supervised and monitored visitation services; sign all releases necessary for FCM to monitor compliance; keep all appointments; and notify the case manager of address, household composition, employment and telephone number; and notify the FCM of any changes within 48 hours of said change." (*Id.*)

[8] While still with Parents, Child's weight would drop on the weekends when the public nurse did not check in. Parents started receiving pre-mixed formula because the public nurse was concerned Parents were not mixing the formula properly. When first placed with the foster family, Child was so "thin and

---

[2] As each exhibit is quite lengthy, we will reference the PDF page numbers assigned to pages in the electronic volumes of exhibits.

[3] The Amends program provides classes "specially designed to provide the most safe and accountable intervention to end all levels of abusive behavior; not simply physical abuse." http://www.amendsprogram.com/ (last visited August 13, 2018).

emaciated," Foster Mother was "afraid to even hold her." (Tr. Vol. III at 14.) After placement, Child's weight stabilized and Child exhibited appropriate growth.

As a child, Mother was diagnosed with Fetal Alcohol Syndrome ("FAS"). Mother has also been diagnosed with a chromosomal translocation that could affect development. Dr. Karen Eisenmenger completed mental health assessments and diagnosed Mother as "Major Depressive Episode, Moderate; and Intellectual Disability, Mild." (Ex. Vol. I at 283.) Dr. Eisenmenger observed and recommended the following for Mother:

1) [Mother]'s poor adaptive functioning and low working memory are concerning; she will likely continue to need community support and monitoring in order to live safely. Both problems are likely related to having fetal alcohol syndrome. Problem-solving, judgment, and reasoning skills are also likely impaired. These factors would likely make parenting without assistance and/or supervision problematic.

2) [Mother] should be assessed by a psychiatrist to determine whether her medication is adequate for managing her depression symptoms. Medication compliance should also be monitored, since she stated her boyfriend does not want her taking the medication and she may not have the reasoning skills to make her own decision.

3) [Mother] may benefit from continued individual parenting support to help her learn to assist in the care of her child appropriately.

4) If [Mother] receives disability benefits, she will likely need a payee to handle her finances; if a family member cannot be utilized, she may require a court-appointed payee.

(*Id*. at 284.)

[10] Mother received homebased therapy with Laura Lochmueller at Ireland Home Based Services ("IHBS"). Lochmueller observed Mother was inconsistent at maintaining the cleanliness of her apartment and left "medication and cleaning supplies" in Child's reach. (Tr. Vol. II at 140.) When Lochmueller pointed out the problems, it took "continued prompting" in order for Mother to understand the problem required resolution. (*Id*. at 141.) Lochmueller noted Mother is unable to multi-task. This was worrisome as Mother could not keep track of Child while attending to any other task.

[11] A guardian was appointed for Mother for a short period of time. The guardian, Arin Norris, assisted Mother with her day-to-day life, such as understanding the questions during the mental health evaluation and filling out the paperwork to file for another protective order ("PO"). Norris thought the PO was appropriate because Mother told Norris, amongst other people, Father had slapped her three times resulting in a bloody nose. However, later, Mother stated she did not want a PO and she requested it be lifted. The guardianship was eventually terminated due to Mother's dishonesty about her relationship with Father. In addition, Father threatened Norris.

[12] Riordan, who was Parents' case manager from Vision 1505, assisted Mother on a daily basis, Monday through Friday. Riordan kept track of Mother's

appointments, provided transportation, and helped Mother apply for disability benefits. Riordan made posters for Mother to put around her apartment explaining how to complete certain tasks around the apartment, such as how to work the thermostat and how to cook certain items in the microwave. When Mother received aid to assist with the purchase of food, Riordan would help her shop for groceries. When Mother did not have food to take to visitation with Child, Riordan would supply it.

[13] On June 28, 2016, Father completed a biopsychosocial evaluation[4] with Dr. Eisenmenger. Dr. Eisenmenger's diagnostic impressions of father were that he reported he had been staying sober, he possibly suffered from post-traumatic stress disorder, and he possibly suffered from a mild neurocognitive disorder. Dr. Eisenmenger recommended Father submit random drug and alcohol screens; complete a drug and alcohol assessment; attend parenting classes; attend anger management classes; and submit to further psychological testing "to determine his level of cognitive functioning, any other psychological disorders, parenting views, and abuse potential." (Ex. Vol. I at 270.) Father made appointments at Southwest Behavioral Healthcare, but he did not cooperate with services and his file was closed for lack of engagement.

---

[4] Dr. Eisenmenger explained the "biopsychosocial clinical interview gets a lot of background information and includes everything that's been going on with DCS, a lot of psychiatric background, abuse background." (Tr. Vol. II at 166.) If she can, she will make a diagnosis on that basis. However, she stated sometimes a person requires more testing. For Mother, both interviews—biopsychosocial and psychological—were done on the same day. Father's interviews occurred in two different sessions and resulted in two different reports. (*See id*. at 167 (Dr. Eisenmenger's explanation for the difference in the reports).)

[14]     On November 10, 2016, Father completed a psychological evaluation with Dr. Eisenmenger. Dr. Eisenmenger's diagnostic impressions were:

> Child Physical Abuse, Suspected (per DCS referral information)[;] Stimulant Use Disorder, In Sustained Remission (per self-report)[;] Cannabis Use Disorder, In Sustained Remission (per self-report)[;] Narcissistic Personality Disorder, With Dependent traits[;] Personal History of Physical Abuse in Childhood[;] Personal History of Sexual Abuse in Childhood

(*Id*. at 274.)

[15]     Dr. Eisenmenger recommended:

> 1) [Father] should be required to remain sober in order to parent safely. Random alcohol and drug testing would support and document his sobriety. Drug and alcohol assessment may be helpful to identify any further services that may help [Father] to remain substance free.
> 2) [Father] may benefit from parenting classes to increase his parenting knowledge and help him cope with parenting stress, especially since [Child] is so young.
> 3) Due to his invalid score on the CAPI-VI abuse measure,[5] as well as the allegations of domestic violence and his own alleged experiences of abuse, [Father] may benefit from anger management classes and/or batter's [sic] intervention classes.
> 4) [Father] should obtain and maintain gainful employment in order to support himself and his family. No psychological

---

[5] Dr. Eisenmenger's report notes Father's "[a]buse score on the CAPI-IV could not be interpreted due to invalid responding." (Ex. Vol. I at 274.)

dysfunction that would preclude continuous employment was discovered.

(*Id.* at 275) (footnote added).

[16] Father received a parent aide and supervised visitation through IHBS. On November 10, 2016, IHBS stopped providing those services when Father "threaten[ed] to throw a service provider through the window." (Tr. Vol. III at 39.) Thereafter, Raintree Consulting provided Father with a parent aide and supervised visitation. They too stopped visits "due to [Father]'s aggressive behavior and also being rude towards the service provider." (*Id.* at 40.) Throughout the case, Father sent FCM Lisenbee "long rants on text messages [and] voicemails[.]" (*Id.* at 41.) Father was asked to stop doing so by the trial court, but he did not comply. Father completed the Amends program in December 2016. However, domestic violence was still present in Parents' relationship, as Mother reported Father had slapped her and she obtained a protective order in February 2017.

[17] On August 21, 2017, DCS filed a Petition for Termination of Parental Rights. On October 17, 2017, Parents married. Mother was arrested for domestic violence in December 2017 and was facing charges for domestic battery at the time of the termination hearing. Another NCO was in place between Parents.

[18] On January 18, and February 15, 2018, the trial court held fact-finding hearings on DCS's termination petition. At these hearings, service providers noted Mother completed all of the court-ordered tasks and Father completed many of

the court-ordered tasks; however, neither Parent showed any progress or improvement. Mother was still unable to maintain a safe home environment. Father still exhibited aggressive and hostile behaviors. Both Parents still engaged in domestic violence. On February 15, 2018, the trial court issued its order terminating Parents' rights to Child.

# Discussion and Decision

[19]    We review termination of parental rights with great deference. *In re K.S., D.S., & B.G.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). We will not reweigh evidence or judge credibility of witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the juvenile court's unique position to assess the evidence, we will set aside a judgment terminating a parent's rights only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied* 534 U.S. 1161 (2002).

[20]    "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. A trial court must subordinate the interests of the parents to those of the children, however, when evaluating the circumstances surrounding a termination. *In re K.S.*, 750 N.E.2d at 837. The right to raise one's own children should not be terminated solely because there is a better home available for the children, *id.*, but parental rights

may be terminated when a parent is unable or unwilling to meet parental responsibilities. *Id.* at 836.

[21] To terminate a parent-child relationship, the State must allege and prove:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State must provide clear and convincing proof of these allegations. *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009), *reh'g denied*. If the court finds the allegations in the petition are true, it must terminate the parent-child relationship. Ind. Code § 31-35-2-8.

[22] When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cty. Office of*

*Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We determine whether the evidence supports the findings and whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference."[6] *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[23] Parents challenge the trial court's conclusions that the conditions under which Child was removed were not likely to be remedied and continuation of the parent-child relationship posed a threat to Child's well-being. As Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, we need only decide if the trial court's findings support one of these requirements. *See In re L.S.*, 717 N.E.2d at 209 (because statute written in disjunctive, court needs to find only one requirement to terminate parental rights). Parents also argue termination is not in Child's best interest.

### Reasonable Probability Conditions Would Not Be Remedied

[24] The trial court must judge a parent's fitness to care for the child at the time of the termination hearing. *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). Evidence of a parent's pattern of unwillingness or lack of commitment to address parenting issues and to cooperate with services "demonstrates the

---

[6] Herein, Parents do not challenge the trial court's findings, and thus we accept them as true. *See Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992) ("Because Madlem does not challenge the findings of the trial court, they must be accepted as correct.").

requisite reasonable probability" that the conditions will not change. *Lang v. Starke Cty. OFC*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied.*

[25]   When assessing a parent's fitness to care for a child, the trial court should view the parents as of the time of the termination hearing and take into account the changes that have occurred during the proceedings. *In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. However, the trial court must also "evaluat[e] the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of [a] child." *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*.

[26]   Parents argue termination is not warranted because they both sufficiently complied with the court's order on services.[7] While we review the changes in the conditions under which Child was removed from Parents' care, we also consider "those bases resulting in continued placement outside the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. Parents do not challenge the trial court's findings supporting its conclusion the conditions under which Child was removed would not be remedied, which include:

---

[7] Parents argue DCS "claimed the provider would no longer supervise the visits" (Br. of Appellants at 21), when in fact the "provider sent [FCM Lisenbee] an email stating they would in fact continue supervising the visits." (*Id.*) Parents argue DCS ignored this email and "never brought it to the Court's attention." (*Id.*) However, this additional fact does not change our decision to affirm the trial court as the facts found by the trial court are more than adequate to support its conclusions, regardless of this information. Additionally, we note Parents also did not bring this information to the trial court's attention.

## B. FACTS RELATING TO CHILD'S CONTINUED REMOVAL FROM PARENTS' HOME AND CARE:

\* \* \* \* \*

4.      Mother is currently facing criminal charges for domestic battery due to a physical altercation which occurred between her and [F]ather in December of 2017. Despite a no contact order being issued in that matter, both [M]other and [F]ather admit to having continued contact since its issuance. Even after being made aware during the pending CHINS that domestic violence is an issue which DCS and the Court expected to have remedied, [P]arents have continued to violate protective orders and to engage in physical altercations, indicating that the violent and abusive behavior seen at the outset of the case is not likely to be remedied.

\* \* \* \* \*

10.      While in the [Aurora] program, Mother has been offered numerous services and near constant supervision due to her limitations. Mother is only able to cook by using a microwave, and even then the instructions must be uncomplicated. Mother is unable to manage finances or food stamps, and has to have someone assist her with shopping for food. Mother struggles with proper medicine management. Mother does not understand how to operate things like a thermostat and has to be provided detailed instructions and assistance. Mother has difficulty with hygiene and is often unkempt due to not washing her clothing. Mother gets disoriented to time and date, and often thinks she has been away from her home for a short time when in actuality it has been days.

11.     Most critically, Mother is unable to understand how to care for [C]hild. When [C]hild was young, [M]other and [F]ather were not providing the correct amount of formula in [C]hild's bottle. More recently, while shopping with Ms. Riordan, Mother asked about buying steaks to make for [Child] to take to visitation although [C]hild didn't have teeth. On multiple occasions, [M]other would not have had food for her visits with [C]hild – and therefore the visits would have been cancelled – had Ms. Riordan not assisted her with shopping and transportation or provided food. Although [M]other has obtained baby items like clothes and bedding with the help of Father and Visions [sic] 1505, it is clear that [M]other does not have the capability of providing care for [C]hild if left alone.

* * * * *

15.     [Lochmueller] noted that [M]other had difficulty multi-tasking and could only focus on one person or issue at a time, which was a concern given that [M]other would need to be able to watch [C]hild while doing other things if [C]hild were in her care.

* * * * *

17.     During the pending CHINS matter, [M]other also participated in a psychological evaluation with Dr. Karen Eisenmenger. Dr. Eisenmenger found that [M]other's IQ is 74, which is in the low/borderline range, and also found that [M]other's working memory and processing speed are low. Based on her scores, it appeared that [M]other is easily manipulated. Most concerningly, Dr. Eisenmenger believes that [Mother] will not be able to take care of herself without help.

18.     Dr. Eisenmenger also conducted an evaluation of [Father]. Father was diagnosed with narcissistic personality disorder. People with this disorder generally are observed to be self-involved and to exploit other people. A concern noted by Dr. Eisenmenger was that in explaining the family's involvement with DCS, [F]ather stated that while he did not mean to hit [C]hild with the bottle during an argument with [M]other, that he did in fact mean to hit [M]other; additionally, Dr. Eisenmenger found that [F]ather may not understanding [sic] developmental needs, that he has low nurturing skills, and that he may expect [C]hild to meet his needs rather than the other way around.

* * * * *

22.     Father is a very large man who has been very aggressive and hostile with the professionals attempting to assist the family, including staff at shelters, staff at Vision 1505, and the DCS family case manager. In [sic] example, he is banned from Visions [sic] 1505 for two years, [F]ather had to be removed from Doctor Elderbrook's [sic] office, the Father called the FCM a racist and over time the FCM felt so threatened by [F]ather he asked for a protective order against the Father. In the history of this judge the DCS has never gone to such extreme measures. This Court had to admonish [F]ather on 8-3-16 to stop being inappropriate with DCS staff and finally on 3-1-17 had to order no more contact between the DCS and the Father, unless it was by mail or through his attorney. The father has even threatened to throw an [IHBS] worker out the window, so those services stopped. Interestingly, the Father has never been inappropriate while in court with this judge, so clearly he can control himself when he wants to even in the most anxious or emotional setting, like this termination trial.

\* \* \* \* \*

25.     The Father has completed a domestic violence program and is being mentored, but clearly has not learned how to control his behavior around people of authority and professionals.

\* \* \* \* \*

27.     Father has repeatedly violated the Court's orders concerning contact with [M]other.

28.     Between the first termination of parental rights hearing and the second day of trial, [M]other and [F]ather also were married, and indicated at trial that their relationship will continue.

29.     In the event that one of the parent's rights were not terminated, it is clear that the [P]arents will stay together no matter what a court orders and this puts the [C]hild at tremendous risk, because of their chaotic relationship. Nothing demonstrates this more than the protective orders and police reports.  These [P]arents are their own worst enemy and while they will always blame the DCS and this Court, nothing is further from the truth.

\* \* \* \* \*

31.     The Mother doesn't trust the Father with the baby. Likewise, the Father doesn't trust [M]other with the baby, but yet they want to parent [C]hild together.

(App. Vol. II at 18-23.)

[27] Although we recognize Parents' substantial compliance with court-ordered services, the service providers were unable to say either parent had actually made any progress. Mother's ability to maintain a safe and clean home environment is marginal, at best. Father has had multiple service providers because of his threatening behavior toward them, including threats to FCM Lisenbee such that the trial court had to limit Father's interactions with DCS. Additionally, throughout these proceedings, regardless whether a protective order was in place, both parents stated they would not allow the trial court's orders to keep them from each other or Child. Parents were repeatedly seen in contact with one another when they should not have been. The trial court's unchallenged findings support its conclusion that the conditions under which Child was removed from Parent's care would not be remedied.[8] *See Matter of A.Q.*, 2018 WL 3015091, at *6 (Ind. Ct. App. June 18, 2018) (termination appropriate when parents, although compliant with services, had made no progress), *trans. pending*.

### Best Interest of Child

[28] In determining what is in Child's best interests, the juvenile court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *See In re A.K.*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010), *trans.*

---

[8] As we conclude the findings support the trial court's determination that the conditions that kept Child from returning to Parents would not be remedied, we need not determine whether the findings also supported the trial court's determination that continuation of the parent-child relationship posed a threat to the well-being of Child. *See, e.g., In re L.S.*, 717 N.E.2d at 209 (court needs find only one as statute written in the disjunctive).

*dismissed*. A parent's historical inability to provide a suitable environment, along with the parent's current inability to do so, supports finding termination of parental rights is in the best interests of the child. *In re A.L.H.*, 774 N.E.2d 896, 990 (Ind. Ct. App. 2002). The recommendations of a DCS case manager and court-appointed advocate to terminate parental rights, in addition to evidence that conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in a child's best interests. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

[29] Parents argue termination is not in the best interest of Child because Child has a bond with Parents and Parents have participated in court-ordered services, including psychiatric evaluations, counseling, parenting classes, and domestic violence classes. Moreover, Father had obtained full-time employment and had housing. Parents express love for Child and both visited regularly when allowed.

[30] All service providers who interacted with Parents and Child supported termination of Parents' rights to Child. As noted above, Parents' situation has not improved and, in some instances, has declined. The issue of domestic violence has not been remedied. DCS and CASA recommended Child be adopted. "Permanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009), *reh'g denied*.

Child is currently in pre-adoptive placement and is doing well there.[9] The trial court agreed adoption would serve the best interests of the child and was a "satisfactory plan." (App. Vol. II at 23.) The trial court's unchallenged findings, as cited above, support its conclusion that termination was in Child's best interest. *See A.D.S. v. Indiana Dept. of Child Servs.*, 987 N.E.2d 1150, 1159 (Ind. Ct. App. 2013) (termination in child's best interests based on child's improvement in foster care), *trans. denied.*

# Conclusion

[31] We conclude the trial court's unchallenged findings support its conclusions that the conditions under which Child was removed from Parents' care would not likely be remedied and that termination was in Child's best interest. We accordingly affirm the termination of Parents' rights to Child.

[32] Affirmed.

Baker, J., and Robb, J., concur.

---

[9] Parents do not challenge the fact the current placement is pre-adoptive. Although the record is sparse as to the details of the proposed adoption, we have no reason to doubt the trial court's finding that the "placement is pre-adoptive." (App. Vol. II at 23.)