## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 11 2019, 10:46 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Nancy A. McCaslin
McCaslin & McCaslin
Elkhart, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of P.R. (Minor Child) and

J.R. (Father),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

February 11, 2019

Court of Appeals Case No.
18A-JT-1771

Appeal from the Elkhart Circuit Court

The Honorable Terry C. Shewmaker, Senior Judge

The Honorable Deborah A. Domine, Magistrate

Trial Court Cause No.
20C01-1705-JT-30

**Mathias, Judge.**

[1] J.R. ("Father") appeals the Elkhart Circuit Court's termination of his parental rights to his daughter, P.R. He argues that the Department of Child Services ("DCS") did not prove his parental rights to P.R. should be terminated by clear and convincing evidence.

[2] We affirm.

## Facts and Procedural History

[3] On June 13, 2016, DCS filed a petition alleging that the thirteen-year-old child, P.R., was a child in need of services ("CHINS"). This petition alleged that P.R. was sexually abused by R.R.'s ("Mother's) boyfriend, resulting in P.R.'s pregnancy, and that Mother was unable to provide a stable home for P.R. At the initial hearing, Mother admitted that P.R. was a CHINS. Father appeared at the initial hearing, stating that he had had limited contact with P.R. since 2005, and did not have any personal knowledge of what occurred in Mother's home. Pursuant to the dispositional order in the CHINS matter dated July 13, 2016, the child was placed in kinship care. Also in accordance with the dispositional order, Father was to have supervised visitation with P.R. Approximately four months later, in a progress report dated November 7, DCS reported that Father had not yet contacted DCS to set up visits with the child.

[4] DCS filed a petition to terminate parental rights on May 22, 2017. The court held a hearing on this petition on September 1, 2017, at which Mother voluntarily relinquished her parental rights. Father did not appear for this hearing, and his rights were terminated. Father filed an appeal on September

29, 2017. On the first appeal, DCS acknowledged that Father was not provided with notice of the termination hearing, and this court remanded the matter to the trial court for further proceedings. A second termination hearing was held on June 26, 2018. At this second termination hearing regarding Father's parental rights, the ongoing family case manager ("FCM") Laura Stapleton, the Court Appointed Special Advocate ("CASA") Cheryl Koester, P.R.'s therapist, Jacyln Clem ("Clem"), and Father testified.

[5] FCM Stapleton testified that she had been an ongoing case manager for DCS for approximately six years. She was assigned to the matter after removal and has been P.R.'s only ongoing case manager. She testified that P.R. was not initially placed with Father in spite of his status as the non-offending parent because he was homeless and registered on the sex offender registry as a "sexual violent perpetrator." Tr. p. 13. She further testified that P.R., a teenager, had been "very verbal about wanting her parent's [sic] rights terminated." Tr. p. 15. Her understanding was that P.R. did not want any contact with her Father. She observed P.R. to be happy in her foster home and that P.R. had told her that P.R. wanted her home to be her forever home. She believed that, given P.R.'s diagnoses of Post Traumatic Stress Disorder ("PTSD") and Reactive Attachment Disorder ("RAD") and the lack of bond between Father and P.R., Father would not be able to meet P.R.'s treatment needs. She was further concerned about Father's lack of a stable home. When FCM Stapleton told P.R. that Father had "kind of, come back into the picture and has been wanting to obtain, or have a relationship with her," P.R. indicated that she did not want

to see Father. Tr. p. 22. P.R. did, however, have a "good-bye" visit with Father. Tr. p. 30. The FCM understood that P.R. "wants to move on." Tr. p. 28. FCM Stapleton testified that P.R. was happy in her foster home and that there were two other kids there and lots of animals. P.R. wanted this to be her "forever home," and the foster parents had indicated a desire to adopt P.R.

[6] Therapist Clem testified that she completed a parenting assessment of J.R. and served as a therapist to P.R. She was unable to complete the observation portion of the parenting assessment because P.R. was not allowed to see J.R. at the time. However, her parenting assessment suggested that J.R. had some personal and inter-personal characteristics similar to those of known physical child abusers. J.R.'s status on the sex offender registry also caused her concern for the possibility of unsupervised contact between P.R. and J.R. In her role as therapist to P.R., she observed that P.R. had internalized her trauma and initially had trouble expressing her emotions. However, over time P.R. learned to identify and express her emotions. The therapist also testified that P.R. wished for both of her parents' rights to be terminated because they did not provide what P.R. needed when she was younger and "she wanted to have better opportunities and to be able to move forward in her life and have a good life." Tr. p. 41. Clem felt that there was no bond between P.R. and Father, that P.R. felt abandoned by Father because he was not there for her and that termination would allow her to move forward in her life and put her past traumas behind her.

[7]     The CASA initially had a lot of concerns when she became involved in the matter as P.R. was fourteen years old and pregnant. She testified that Father had not had a relationship with P.R. for some amount of time, and during the time she served as CASA, there was no contact between P.R. and Father. Father was not present for the Child and Family Team Meetings ("CFTMs") or court hearings. She further testified that in the beginning of the case, in August and September of 2016, P.R. had indicated that she would agree to supervised visitation with Father if Father wanted to see her, but Father did not initiate any request to see her. She also believed that DCS had a hard time getting in touch with Father. She later proofread a letter P.R. sent to the court indicating that P.R. did not want to see Father any more. The CASA understood that P.R. wanted the termination because she wanted to be adopted. She also observed that P.R. felt abandoned by Father and that a forced relationship with her Father would be very disruptive.

[8]     Father testified that he was on the Indiana Sex Offender Registry and that this registry shows him as homeless. He further testified that he could not live with his wife due to issues with the registry and the apartment complex. He does, however, use the address for his mailing address. He was trying to save money to purchase a home that he could live in with his wife. Father also testified that he had a strong bond with P.R. until she was approximately four years old. During that time, P.R.'s mom was in the picture "[o]ff and on, because she's too busy doing drugs." Tr. p. 63. According to Father, a sheriff told him he had no legal custody to P.R. and that he "g[a]ve [her] up". Tr. p. 64. Mother had

found a new boyfriend, and Father tried to get in contact with P.R., but Mother had pushed him away because she was with someone else. He became aware of DCS involvement with P.R. in June of 2016 when Mother called him to let him know DCS was removing P.R. from her care. He initially did not believe Mother because he thought she was likely on drugs, but he appeared at the initial hearing once he received a letter. He agreed that he likely missed a lot of court hearings due to his mailing situation. Father testified that he did not want to lose his rights due to what happened to P.R. because he was not the one who caused it. He did not believe the testimony of the FCM and the therapist that P.R. wanted the rights of her parents to be terminated so she could move on.

[9] The trial court entered an order terminating Father's parental rights the next day, on June 27, 2018. Father filed the instant appeal.

## Discussion and Decision

[10] The termination of parental rights is controlled by Indiana Code section 31-35-2-4(b)(2), which provides that a petition to terminate parental rights must allege:

> (A) that one (1) of the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>>
>> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

The burden is on DCS to prove each element by clear and convincing evidence. I.C. § 31-37-14-2; *In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009). However, as Ind. Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the trial court is required to find that only one prong of that subsection has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010). If the court finds the allegations in a petition are true, the court shall terminate the parent-child relationship. I.C. § 31-35-2-8(a). If the court does not

find that the allegations in the petition are true, it shall dismiss the petition. *Id.* at § 8(b).

[12] We have often noted that the purpose of terminating parental rights is not to punish parents but instead to protect their children. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004). Although parental rights are constitutionally protected, the law allows for the termination of such rights when parents are unable or unwilling to meet their responsibility as parents. *Id.* Indeed, a parent's interests must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.at 1259. The court need not wait until a child is harmed irreversibly before terminating the parent-child relationship. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). An inability to provide adequate housing, stability, and supervision, combined with the current inability to provide the same, will support a finding that continuation of the parent-child relationship is contrary to the child's best interests. *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005).

[13] We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh evidence nor judge witness credibility. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). Rather, we consider only the evidence and inferences most favorable to the judgment. *Id.* When we review a trial court's findings of fact and conclusions of law in a case involving the termination of parental rights, we first determine whether the evidence supports the findings;

secondly, we determine whether the findings support the judgment. *A.D.S. v.*
*Indiana Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans.*
*denied.*

[14] In its June 27, 2018 order, the trial court found that "DCS has proven the four
elements contained in the cited statute" and listed findings of facts in support of
its conclusions. Appellant's App. Vol. II. pp. 12–19. Here, the evidence
supported all of the trial court's findings, and the findings supported the
judgment.

[15] The evidence supported the trial court's findings that P.R. had been adjudicated
a CHINS since June 16, 2016 and had not been returned to the care of her
parents at the time of the termination order, establishing the requirements of
Ind. Code section 31-35-2-4(b)(2)(A)(i). The foster family with whom P.R. had
been living indicated that they intended to adopt if parental rights were
terminated, and the CASA, FCM, and therapist all testified that P.R. was
happy in her current home, supporting the findings made by the trial court with
respect to Ind. Code section 31-35-2-4(b)(2)(D).

[16] The evidence also supported the trial court's findings that termination was in
P.R.'s best interest. The therapist testified that P.R. was happy in her foster
home and that the child wanted a fresh start, away from the homelessness and
drug use. The therapist also testified that failure to terminate parental rights
would be harmful to the child and cause P.R. to lose trust and faith in
humanity. The FCM testified that P.R. is aware that Father had recently

wanted to be involved in her life in spite of his previous absence and lack of participation, and P.R. did not want contact. She testified the child wanted to move on and that J.R. was unable to properly care for the child. The evidence supported the trial court's findings with respect Ind. Code section 31-35-2-4(b)(2)(C).

[17] In support of its finding that continuation of the parent-child relationship posed a threat to the well-being of the child, the trial court relied on evidence that, at the time of P.R.'s removal, Father was homeless, he was under probation supervision for a serious sex offense, and he had no bond with P.R. The trial court also relied on evidence that, at the time of P.R.'s removal, J.R. had not seen P.R. for nine years and took no action to gain custody of her in spite of his acknowledgement that he was aware that Mother was unstable and using drugs.

[18] The trial court also relied on evidence that a referral was made for Father to establish supervised visitation for an eight-month period in the CHINS proceeding, but Father never made contact. When he finally did re-appear, P.R., a teenager, indicated that she did not want to visit with her father. The trial court also concluded that P.R. blamed Father for abandoning her and not protecting her from the trauma she experienced. The trial court also relied on the parenting assessment completed by the therapist that Father was at high risk to abuse, the fact that Father could not live with his wife, and that he was registered on the sex offender registry as homeless in support of its conclusions that the continuation of the parent-child relationship posed a threat to the well-

being of the child. This evidence presented at the termination more than supports the trial court's findings.[1]

## Conclusion

Having concluded that clear and convincing evidence supports the trial court's findings, and that DCS established all of the requirements in Ind. Code section 31-35-2-4(b) for the termination of Father's parental rights to P.R. by clear and convincing evidence, we affirm the trial court's order of June 27, 2018 terminating J.R.'s parental rights to P.R.

Affirmed.

Vaidik, C.J., and Crone, J., concur.

---

[1] Since we have concluded that DCS has proven by clear and convincing evidence that a continuation of the parent-child relationship poses a threat to the well-being of the child, we do not need to reach whether there is a reasonable probability that the conditions that led to removal will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B); *see also In re A.K.*, 924 N.E.2d at 220.