## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 20 2020, 8:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Christopher Taylor-Price
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Public Defender
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re: The Termination of the Parent-Child Relationship of M.L.N. (Minor Child);

M.N. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

and

Child Advocates, Inc.,

*Guardian Ad Litem.*

October 20, 2020

Court of Appeals Case No. 20A-JT-701

Appeal from the Marion Superior Court

The Honorable Marilyn Moores, Judge
The Honorable Scott Stowers, Magistrate

Trial Court Cause No. 49D09-1905-JT-554

**Pyle, Judge.**

## Statement of the Case

M.N. ("Father") appeals the termination of the parent-child relationship with his son, M.L.N. ("M.L.N.").[1]  He contends that Department of Child Services ("DCS") failed to prove by clear and convincing evidence that:  (1) there is a reasonable probability that the conditions that resulted in M.L.N.'s removal or the reasons for placement outside Father's home will not be remedied; and (2) a continuation of the parent-child relationship poses a threat to M.L.N.'s well-being.  Concluding that there is sufficient evidence to support the trial court's termination of the parent-child relationship, we affirm the trial court's judgment.

We affirm.

## Issue

> Whether there is sufficient evidence to support the termination of the parent-child relationship.

## Facts

The evidence and reasonable inferences that support the judgment reveal that Father is the parent of M.L.N., who was born in October 2017.  Mother, who has an extensive history of illegal drug use and who had an open Child in Need

---

[1] M.L.N.'s mother ("Mother") voluntarily relinquished her parental rights and is not a party to this appeal.

of Services ("CHINS") case involving her older children, tested positive for cocaine and marijuana while she was pregnant with M.L.N. When M.L.N.'s meconium tested positive for cocaine at birth, DCS removed him from Mother and placed him in foster care with his half-siblings.[2] Mother and Father were not living together when M.L.N. was born. DCS did not place M.L.N. with Father because Father did not have stable housing.

[4] In October 2017, DCS filed a petition alleging that M.L.N. was a CHINS. At an October 2017 initial CHINS hearing, Father agreed to submit to a drug screen but stated that the screen might be positive for marijuana. Also at the hearing, DCS recommended that Father attend supervised visits with M.L.N. and participate in random drug screens and parenting education.

[5] Father visited with M.L.N. weekly until May 2018, when, following a SWAT Team raid, Father was arrested and charged with nine felonies. Specifically, the State charged Father with: (1) Level 2 felony dealing in cocaine; (2) Level 3 felony possession of cocaine; (3) Level 4 felony possession of a narcotic drug (heroin); (4) Level 4 felony unlawful possession of a firearm by a serious violent felon (Colt handgun); (5) Level 4 felony unlawful possession of a firearm by a serious violent felon (Taurus handgun); (6) Level 4 felony unlawful possession of a firearm by a serious violent felon (Ruger handgun); (7) Level 4 felony

---

[2] M.L.N. is the only child that Mother and Father have together. Mother has two additional children who have been placed together in foster care with the one of the children's paternal grandmother. Father has seven additional children.

unlawful possession of a firearm by a serious violent felon (Glock handgun); (8) Level 6 felony possession of marijuana; and (9) Level 6 felony maintaining a common nuisance (controlled substances).

[6] In July 2018, the trial court adjudicated M.L.N. to be a CHINS. In an August 2018 CHINS dispositional order, the trial court ordered Father to contact DCS within seventy-two hours of his release from incarceration.

[7] In November 2018, Father pled guilty to Level 2 felony dealing in cocaine and Level 4 felony unlawful possession of a firearm by a serious violent felon. Pursuant to the terms of a plea agreement, the State dismissed the remaining seven charges. The trial court sentenced Father to sixteen (16) years for the Level 2 felony and eight (8) years for the Level 4 felony. In addition, the trial court ordered the sentences to run concurrently with each other.

[8] In May 2019, DCS filed a petition to terminate Father's parental relationship with M.L.N. The trial court held a termination hearing in February 2020. Father participated in the hearing telephonically from the Miami Correctional Facility. Father testified that he had been incarcerated since his May 2018 arrest. According to Father, he spent eighteen months in the Marion County jail before being transferred to the Miami Correctional Facility. Father testified that he is scheduled to be released from the Department of Correction in 2025. Father further testified that he could be released as early as 2023 because of his eligibility for credit time. Father also testified that he had not seen M.L.N. in almost two years, and the last time that he had seen his son, M.L.N. was seven

months old. Father further testified that he was taking literacy classes to prepare for his GED. Upon completion of that program, Father planned to participate in a substance abuse program. According to Father, he had "great" relationships with his seven other children. (Tr. 23).

[9] Also at the hearing, DCS Family Case Manager Britney Richardson ("FCM Richardson") testified that Father had never progressed beyond supervised visitation with M.L.N. because: (1) DCS had never been able to verify that Father had stable housing; and (2) Father had been inconsistent in his participation in drug screens. FCM Richardson also testified that termination and foster parent adoption was in M.L.N.'s best interests. Specifically, FCM Richardson explained as follows:

> [Father] is going to be incarcerated for at least the next few years. [M.L.N.] has been in limbo for the past two. I think it would be in his best interest to have him in a stable environment so he could continue on with his life[.] I believe that it is in [M.L.N.'s] best interest to have his forever home with the family . . . that has raised him and that has . . . taken part in his everyday life, who he knows as family. He continues to thrive in his current placement. He continues to thrive being around his siblings and I think that that is in the best interest of him.

(Tr. 39, 40).

[10] Guardian Ad Litem Rabia Baksh ("GAL Baksh") also testified that termination was in M.L.N.'s best interests. Specifically, GAL Baksh explained that Father "had not demonstrated the ability to provide a safe and nurturing home for [M.L.N.]" (Tr. 53). GAL Baksh also pointed out that M.L.N., who was only

seven months old when Father was incarcerated, had been living, since birth, with his foster family, which included his siblings. GAL Baksh further testified as follows:

> [M.L.N.] is a playful, energetic toddler. He is very comfortable in the home setting[.] He is r[a]mbu[nc]tious, he is playful. When I visit sometimes he will look for comfort towards the caregiver when I interact with him. [A]t the most recent visit, he had a rice [k]rispie square and he was taking it from me and he was telling me no, mine and when he couldn't get it, he looked to the caregiver for comfort. So, I notice that they are bonded and he looks for comfort from her.

(Tr. 52).

[11] Following the hearing, in February 2020, the trial court issued an order terminating Father's parental relationship with M.L.N. Father appeals.

# Decision

[12] Father contends that there is insufficient evidence to support the termination of his parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their child. *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013). However, the law provides for termination of that right when parents are unwilling or unable to meet their parental responsibilities. *In re Bester*, 839 N.E.2d 143, 147 (Ind. 2005). The purpose of terminating parental rights is not to punish the parents but to protect their child. *In re L.S.,* 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied.* When reviewing the termination of parental rights, we will

not weigh the evidence or judge the credibility of the witnesses. *K.T.K.*, 989 N.E.2d at 1229. Rather, we consider only the evidence and reasonable inferences that support the judgment. *Id.*

[13] A petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.*, 989 N.E.2d at 1231.

[14] Here, Father first contends that the evidence is insufficient to show that there is a reasonable probability that: (1) the conditions that resulted in M.L.N.'s removal or the reasons for placement outside the parent's home will not be remedied; and (2) a continuation of the parent-child relationships poses a threat to M.L.N.'s well-being.

[15] At the outset, we note that INDIANA CODE § 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, DCS is required to establish by clear and convincing evidence only one of the three requirements of subsection (B). *In re A.K.,* 924 N.E.2d 212, 220 (Ind. Ct. App. 2010). We therefore discuss only whether there is a reasonable probability that the conditions that resulted in M.L.N.'s removal or the reasons for his placement outside the home will not be remedied.

[16] In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). We first identify the conditions that led to the removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* Habitual conduct may include a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and a lack of adequate housing and employment. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of his future behavior. *E.M.*, 4 N.E.3d at 643.

[17]     Here, our review of the evidence reveals that DCS removed M.L.N. from Mother the day he was born because his meconium tested positive for cocaine. DCS did not place M.L.N. with Father because Father did not have stable housing. Instead, DCS placed M.L.N. in foster care with his half-siblings. Although Father initially attended supervised visits with his infant son, when M.L.N was seven months old, Father was arrested and charged with nine felony offenses following a SWAT Team raid. Father eventually pled guilty to two of the felonies, and the trial court sentenced him to sixteen years in the Department of Correction. Father, who has not seen M.L.N. in almost two years, has never been able to provide M.L.N. with safe and stable housing. Father remains unable to provide safe and stable housing for his son because Father is incarcerated. Meanwhile, M.L.N. has bonded with his foster mother and is thriving in foster care with his siblings. This evidence supports the trial court's conclusion that there was a reasonable probability that the reasons for M.L.N.'s placement outside the home would not be remedied. We find no error.

[18]     We reverse a termination of parental rights "only upon a showing of 'clear error' - that which leaves us with a definite and firm conviction that a mistake has been made." *Egly v. Blackford Cty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We find no such error here and therefore affirm the trial court.

[19]     Affirmed.

Kirsch, J., and Tavitas, J., concur.